Henry W. Lengyel, J.
The claim herein was brought for personal injuries sustained by the infant claimant on August 22, 1963, at Belleayre Mt. Ski Center in Highmount, Ulster County, New York; and, for the related medical expenses and loss of services sustained by her father. Said personal injuries were allegedly caused by the negligence of the State of New York in the operation of the aerial chair lift at said ski center. The title of the claim was amended during the trial to reflect the marital status of said infant claimant as of February 28, 1966. The claim was duly filed.
*450 In August, 1963, the State of New York owned and operated said ski center. During the Summer months a portion of the aerial chair lift was in operation to transport tourists to the top of Belleayre Mountain, where hiking trails and picnic areas were available for their use. A charge of $1 was made for a round trip on said chair lift.
The chair lift was 2,950 feet in length with a vertical rise of 783 feet. The individual double chairs were suspended from a continuous cable which was moored on 19 metal towers and 2 terminal structures. The chair lift was attended by three State employees, one at the base terminal and two at the top terminal. During August, 1963," and specifically on August 22, 1963, the operating hours for the chair lift and passengers were between 9:30 a.m. and 5:50 p.m.
The chairs on the lift were double chairs, so that two persons could sit adjacent to one another. Each chair, however, was an individual unit with a safety bar and footrest. "When the lift cable was placed in motion at 9:30 a.m., it operated continuously, unless shut down for an emergency, until the lift was closed for the evening at about 6:00 p.m.
Claimants’ counsel contended that the State assumed the status of a common carrier in its operation of said chair lift; and, consequently, owed the infant claimant the duty “ to use the utmost foresight as to possible dangers and the utmost prudence in guarding against them.” (Vogel v. State of New York, 204 Misc. 614, 620.) The common carrier doctrine was followed in Grauer v. State of New York (15 Misc 2d 471, affd. 9 A D 2d 829) and Battalla v. State of New York (26 A D 2d 203). However, all of the above decisions involved aerial chair lift accidents which occurred prior to April 23, 1963. At the legislative session of 1963, subdivision 9 of section 2 of the Public Service Law was amended, effective April 23, 1963, to provide that ‘ ‘ The term ‘ common carrier ’ * * * includes * * '* any such agency for public use in the conveyance of persons or property within this state other than by use of ski tows and other passenger tramways operated at ski centers ”, As the incident herein occurred on August 22,1963, we are bound by said legislative amendment and find that the State was not a common carrier in the operation of said chair lift. However, we also find that the State owed claimants the duty to exercise reasonable care in the operation of said chair lift. As stated in Grauer v. State of New York (9 A D 2d 829, 830): “In view of the fact however that the lift was a constantly moving device it is obvious on the face of it that the State owed a duty to use every reasonable care to see to it that each passenger *451 was seated safely; and this duty existed whether the State is technically classified as a common carrier or not.”
On August 22, 1963, Ruth Friedman was 16 years of age and had been reared in the Hebrew faith by parents who adhered to ultra-orthodox tenets. She had been educated in Yeshiva schools and her own religious adherence included a strict observance of the laws, traditions, and customs of the Hebrew religion. She had completed her sophomore year in high school and was in good physical and mental health. She was athletically inclined and in the Summer of 1963 was employed as a counsellor and lifeguard at Camp ■Shiroh, an Orthodox Jewish children’s camp located at Parksville, Sullivan County, New York. She had one day off a week which she generally spent with a Jack Katz, 19 years of age, and another counselor. As August 22 was her day-off, she and Jack Katz decided to take a picnic lunch and drive to Belleayre Mt. Ski Center for an afternoon of sightseeing. The other counselor could not accompany them on that date. They arrived at Belleayre in the early afternoon and, after parking the car, walked to the chair lift terminal at the base of the mountain. Mr. Katz purchased two round-trip tickets and they ascended the mountain via said chair lift. At the trial, both Miss Friedman and Mr. Katz testified that no one advised them at the base terminal or at the apex terminal that the lift operation closed for passenger traffic at 5:50 p.m. Both of them denied observing any signs advising the hours of operation of the ski lift for passenger traffic. However, at the examination before trial of Miss Friedman conducted on October 9, 1965, she stated that she knew the closing time was 5:30 p.m. because of “ the sign”. However, she could not remember whether she or Mr. Katz saw the sign; or, whether the sign was at the top or bottom of the mountain.
After arriving at the top of the chair lift, they walked away from the ski lift area, through the picnic area to an area, where they were out of sight of the ski lift terminal, and had their picnic lunch. They then wandered around the area sight-seeing. Miss Friedman testified that it started to become colder, she was dressed in a cotton skirt, light blouse, and sneakers, and that she thought she looked at her watch and, as it was about 5:10 p.m., she said they should go back down the mountain. Mr. Katz thought it was about 5 -.30 p.m. when they decided to go back down the mountain. It took them about 10 to 15 minutes to walk to the chair lift area. When they arrived there, they found it deserted but the chair lift was still in operation. Mr. Katz suggested that they walk the trial down but Miss Friedman was cold and tired and, as they had purchased round-trip tickets, *452 suggested that they get on the chair lift and ride it down the mountain; which they did. They did not observe any barriers which prevented their walking to the loading platform; and, they did not have to climb over, through, or under any barriers to reach the loading platform. They did not observe any signs which forbade their entering the loading area when attendants were not present. A few minutes after they started down on the chair lift, at about towers 15 and 16, the chair lift ceased operation and these two young people were stranded, suspended 20 to 25 feet in the air. They screamed and yelled for help for over 15' minutes but to no avail. They discussed their situation and Miss Friedman became agitated, panicky and reached a stage of near hysteria at the prospect of being stranded on the mountain, 25 feet in the air, overnight. It is our opinion, and we so find, that she reached the hysterical frame of reference for two reasons. In the first instance, it does not require much imagination or experience to determine that a lightly dressed 16-year-old city girl might become hysterical at the prospect of spending a night on a mountainside, suspended in the air and with no apparent reason to hope for rescue until the next morning. Secondly, we must add to the fact of expect-able hysteria, the moral compulsion this young lady believed she was under, not to spend a night alone with a man.
Claimants called Rabbi Herschel Stahl to testify as an expert witness on the Hebrew law and the orthodox interpretation and observance of said law. The Rabbi knew Miss Friedman and her family and he knew that she had been reared in an orthodox observance of her faith. Rabbi Stahl advised the court that under the Hebrew law, the Shulchcm Arukh, there is a specific law, the Jichud, which absolutely forbids a woman to stay with a man in a place which is not available to a third person. To violate this Jichud would be an overwhelming moral sin which would not only absolutely ruin this young girl’s reputation but also the reputation of her parents. It was his opinion that a girl who had been trained in a 100% orthodox home, as Miss Friedman was, might go even to the lengths of jumping to her death to avoid violation of the Jichud. The court was treated to a skillful, albeit rather vehement, cross-examination of Rabbi Stahl. It led us to the conclusion that, while a member of the liberal or conservative wings of Judaism might disagree with the Rabbi’s interpretation of Hebrew law, it was entirely within the realm of possibilities,' that a 100% orthodox member of Judaism, which Miss Friedman was, would agree with said interpretation. It appears to the court that the point is not whether Rabbi Stahl gave us an *453 absolutely correct interpretation of Hebrew law, although we hasten to add that we admired his composure, intellect, background, and obvious sincere truthfulness in his answers; but, whether there is a branch of Judaism which believes in this interpretation; and, whether Miss Friedman is a member of this group. We must answer both of these points in the affirmative. Certainly, Rabbi Stahl’s testimony established a basis for the moral compulsion that Miss Friedman believed she was under and which, in our opinion, increased the hysteria we believe a young girl might well experience regardless of faith. As stated by Justice Fbankftjbteb. in Watts v. Indiana (338 U. S. 49, 52): ‘ ‘ There is torture of mind as well as body; the will is as much affected by fear as by force.”
In an effort to extricate herself from this situation, Miss Friedman worked her way out of the chair to a position where she was holding onto the bottom of the chair. Her next recollection was that she found herself on the ground. When she was able to get to her feet, her face was covered with blood and she was in pain. She worked her way up the mountain to the terminal lodge and broke into the lodge to use the telephone, but the phone was dead. She then struggled down the mountain to the intermediate cabin and broke into that building to use the telephone, but the phone was dead. She then made her way down the mountain to the base lodge where she again broke in and this time found a telephone in working order. She telephoned the State Police who sent help to the lodge. The chair lift was placed in operation, Mr. Katz brought down and Miss Friedman was taken to a physician for first aid.
The State moved to dismiss the claim on the grounds that the claimants had not sustained their burden of proving negligence on the part of the State; and, that Miss Friedman had been contributorily negligent. We .reserved decision on said motion. We now deny said motion.
The State’s witnesses testified there was a sign at the base of the mountain which indicated that passengers would not be loaded to go up the mountain after 5:30 p.m. At the trial, the infant claimant did not remember seeing any such sign but, as stated previously, she did state at her examination before trial that she knew the closing time Avas 5:30 p.m., because either she or Mr. Katz saw a sign which so indicated. Obviously, this must have been the sign but we do not consider it had any relevancy to the policy of loading passengers at the top of the mountain; or, to the issues in this claim. Both Miss Friedman and Mr. Katz stated they were not told they had a 5:50 p.m. deadline to meet if they wished to ride down the mountain; and, they were *454 sold round-trip tickets. They both stated they saw no sign at the apex terminus indicating a 5:50 p.m. deadline; and, they were not told of this fact by the attendants at that location. In fact, however, there was a sign at the apex terminus with the legend “ Last Passenger Down 5:50 p.m.” However, it is our opinion that said sign was so mounted on a tree as to be easily missed, especially by a 16-year-old girl who had just completed her first chair lift ride and who was enthralled by the vistas of beauty offered by nature at the top of the mountain. There was another 5:50 p.m. sign in the attendants’ shed near the registration book at the top terminus. However, this sign would be obscured except to one who registered and neither Miss Friedman nor Mr. Katz did so. There was no requirement that they sign this guest book and it was not drawn to their attention. We find the State to have been negligent in the emplacement of the signs; the size of the signs; and the almost nonexistent effort which was made to advise passengers of the rules of operation.
The first step in the procedure for closing the lift in the evening was for the attendant at the base terminus to telephone the summit attendants and advise them that no more passengers would be on the lift, after the passenger in a certain numbered chair. After those passengers alighted, the two attendants at the top were supposed to inspect the top of the mountain to determine whether any other tourists or sightseers were on the mountain. On August 22, the attendants searched the area to the right of the mountain but not to the left. One attendant did ask a man who came from the left area, where the infant cláimant was, whether he saw anyone in that area. This man said 11 No ” and the attendant accepted this and did not inspect said area. We consider this a negligent performance of duty. There was a loudspeaker mounted at the apex terminus. It could be heard all over the mountaintop but it was not used to announce that the lift was closing down for the night. We consider this a negligent performance of duty.
At about 5:50 p.m., the two apex attendants boarded the chair lift. Mr. Aley, one of the attendants, stated that, as was his custom, he looked over his shoulder to observe whether any passengers got on the chair lift after the attendants. He could see the chair lift loading platform until he reached tower 7. However, because of the contours of the mountain, there was a blind spot from tower 7 to tower 16, where one could not observe either the top or the base loading platforms. There was sight distance from the base to the apex loading platforms. We consider that the State’s witness admitted the expectable possibility that passengers could and would load onto the chairs *455 after the attendants had left the apex loading area. To accept this possibility and to ignore the blind spot area was negligent operation of the chair lift. Mr. Aley stated that the trip down took five minutes and that the three attendants shut down the lift and were on their way home by 6:00 p.m. We admire their precipitous efficiency. If we accept Mr. Aley’s time schedule, and we believe him to have been truthful, the infant claimant and Mr. Katz loaded themselves onto the chair lift and proceeded down the mountain in the two or three minute interval when the loading platform was out of view. The timing which permitted this accident to occur was inadvertently exquisitely perfect.
The State contended that the fencing and signs at the summit loading platform were sufficient to protect against passengers loading on the chair lift when attendants were not present. However, this contention does not withstand scrutiny. There was a log type fence around the loading platform with an entrance gate, about 4 feet wide, leading onto the loading platform. There was a rope to stretch across this opening; and, there was a sign in the center area of the chair lift which faced this opening and which stated, “No loading without attendant.” Mr. Aley thought he had put up the rope barrier but he could not be positive that he had done so. However, and more importantly, there was an 18 feet wide gap in the fence area traversed by the chairs. We do not recollect testimony relative to the spacing between double chairs. However, from the photographs, Exhibits 1 ‘ BB ’ ’ and “ E ”, we estimate there was about 50 to 60 feet between chairs. It thus became possible, with safety, to walk through the 18 feet wide gap onto the loading platform, with the loading sign to one’s left and not in the direct line of sight, and to load onto said chairs; which is what these two young people did. We find that to leave this gap in the fencing, while the lift was operating without attendants, was negligence on the part of the State. Further, we point out that even if these young people had seen the sign, which they did not, they were not injured while loading onto the lift. So that if we found them contributorily negligent in this aspect, which we do not, the effects of such negligence had been dissipated and they were safely on their way down the mountain when the chair lift was stopped leaving them suspended in a precarious position.
It is our opinion, and we find, that the State did not exercise reasonable care to protect this infant claimant. There were no fixed safety standards for the operation of aerial chair lifts in New York State in 1963. However, the manager of the ski area was familiar with the Safety Code for Aerial Tramways, *456 (June 8, 1960), which provided at page 26, § 3.5. 19.1, that in the operation of a chair lift, 11 There shall be a minimum of one attendant at each station when the station is being used for loading and unloading. ’ ’; and, that at least one attendant shall, “keep the operation under observation at all times.” On January 1, 1965, the State Department of Labor established rules for the operation of chair lifts under code rule 32. In subdivisions (c) and (d) of rule 32.51, it was provided:
(c) “ * * An attendant shall be on duty at all loading and unloading areas during operation of the tramway.”
(d) “ * * * An attendant shall be on duty at the power end of the tramway during its operation. An additional attendant at the end opposite the power end shall be provided if the length of the tramway exceeds 800 feet or if the attendant at the power end is unable to observe each passenger clearly at all times during his travel from the loading point to the highest unloading point of the tramway.” (12 NYCRR 32.51 [c], [d].)
We consider these rules of 1965 to be merely a codification of what common sense and ordinary reasonable care required of the State, or any other tramway operator, in 1963. We find that the State was negligent in the operation of said chair lift; and, that said negligence was the proximate cause of the injuries sustained by the claimant herein.
For the reasons set forth above, we find that infant claimant was free from contributory negligence. If the claimant had been an adult, we still would find freedom from contributory negligence. In evaluating the issue of contributory negligence, as it related to this infant, the fact of freedom from negligence is even more evident when we consider her age, judgment, experience, and education. The State’s negligence placed this 16-year-old girl in an untenable position. As stated in claimants ’ brief, ‘ ‘ In that type of situation, the famous dictum of Mr. Justice Cakdozo that ‘ danger invites rescue ’ might well be adapted into ‘ peril invites escape ’.”
The State Police brought Miss Friedman to a Dr. Rottkov for emergency treatment. The doctor found that she had sustained a .severe laceration of the nose and a possible fracture. He performed emergency first aid and treated her for shock. Subsequently, she was removed to the Liberty Maimonides Hospital where she remained from August 23, 1963 to September 2, 1963. She was confined to bed until August 26, 1963. The diagnosis at said hospital was (1) compound fracture of the nose; (2) laceration, 1 1/2 cm., of the left eyelid; (3) whiplash injury of the neck with minimal forward slipping, C2 and 03; (4) anxiety with nightmares; (5) multiple bruises and abrasions *457 of the knees and elbows; and, (6) trauma to the left shoulder. The X-ray report by the hospital roentgenologist was negative as to bony injuries of the skull. Dr. Bessen treated her at said hospital. He testified that she had sustained an extensive laceration of the nose which ripped the entire nostril open all the way up to the bridge of the nose. The laceration extended the entire length and depth of the nose and the nares had to be completely reconstructed. Dr. Bessen advised that Miss Friedman required follow up care after she returned to her home and that he recommended she go to a Dr. Saltzman. Mr. Friedman paid Dr. Bessen $750; Dr. Saltzman $200; and Liberty Maimonides Hospital $410.13. In the Fall of 1964 Miss Friedman experienced trouble with her breathing and went to Dr. Sidney Kahn, a specialist in plastic surgery. He found that she had a marked deviation of the profile line of the nose to the left; a rounded profile on the side view; a deviation of the nasal septum to the left; a thickening of the left ala due to scarring; and, a notch or small defect of the rim of the left nostril. Dr. Kahn operated on her at Beth Israel Hospital in New York City on January 5, 1965. She was in the hospital from January 4,1965 through January 8, 1965. The surgical procedure consisted of a nasal reconstruction including removal of the profile convexity; narrowing the nose to the extent possible; removal of that portion of the septum that was deviated; and, a repair of the notched deformity of the rim of the left nostril. Dr. Kahn stated that the operative procedures caused a 75% improvement in the condition that she presented to him in December, 1964. He stated that some deviation of the nose and some thickness of the left side of the nose would be permanent. He also thought that the irregularity of the rim of the left nostril could be corrected by further surgery. Miss Friedman suffered discomfort for about 13 days after the operation; however, it took about a year after the operation for the swelling in the nasal area of the face to completely subside. The accident of August 22 was the cause of the condition and injuries to the nose as above described. Dr. Kahn’s medical bill was $615 and the Beth Israel Hospital bill was $256.40. These bills were paid by Mr. Friedman.
On March 18,1964, Miss Friedman testified that she ‘1 blacked out ” and fell on a subway platform in New York City. She went to Dr. Emanuel Dubrow, her family pediatrician, who treated her for a slight laceration of the right labia majora. Miss Friedman stated she again lost consciousness on May 15, 1964, while she was at school. She again went to Dr. Dubrow who made a tentative diagnosis of post-traumatic convulsive disorder and had her admitted to Beth Israel Hospital on the *458 same date. She remained in the hospital until May 22, 1964. Dr. Kirschenbaum, a board certified neurosurgeon, was called into consultation. On the day of admission, Miss Friedman began her menstrual period and experienced generalized abdominal pain. She fainted and lost consciousness for about five minutes and in the following 30 minutes she could hear what was said but was unable to move any of her-limbs. An electroencephalogram and a pneumoencephalogram were performed at the hospital, as well as a general neurological workup of the patient, including a skull X ray. No significant abnormalities were determined from the skull X ray; and, the electroencephalogram was normal. Dr. Kirschenbaum stated that he interpreted the X rays from the pneumoencephalogram to indicate a blunting of the lateral angles of both ventricles which indicated to him a certain amount of cerebral atrophy. He diagnosed her condition as a post-traumatic convulsive disorder and prescribed 100 milligrams of Dilantin, an anticonvulsive medication, three times a day. He also stated that the severe headaches, irritability, and forgetfulness, of which Miss Friedman complains to this day, were more consistent with a post-concussion syndrome following a head injury, than with post-traumatic convulsive disorder. He stated that she probably would be on Dilantin the rest of her life. It should be noted here that Dr. Geffen, a board certified roentgenologist at Beth Israel Hospital, read the X rays which resulted from the pneumoencephalogram as negative of any abnormal condition. Of course, it is not unusual for a roentgenologist to disagree with the attending physician in the interpretation of X rays.
The State’s expert, Dr. Drislane, was a board certified neurologist and an assistant professor in clinical neurology at Albany Medical Center. He examined Miss Friedman in March, 1967. After taking her history, which included a fainting spell about two months after said accident and six fainting spells in all, he performed a neurological examination and an electroencephalogram. He made no abnormal findings and the electroencephalogram was normal, as was the electroencephalogram taken in 1964. He also examined the X rays of the pneumoencephalogram taken in 1964 and found same to be normal. It was his opinion that Miss Friedman was not suffering from a post-traumatic convulsive disorder. Thus, we have two qualified experts in their fields disagreeing diametrically on the diagnosis related to this young lady, Standing alone, we would tend to accept the opinion of the attending physician as one who was closer to the case with more of an opportunity for observation. However, in response to the following question at the end of *459 his cross-examination, Dr. Kirschenbaum made the following answer:
“ Q. Is your opinion that she will be required to take Dilantin for the rest of her life based upon the fact that you are not sure that she has a convulsive disorder, and the better part of discretion requires that she continue to take Dilantin? A. That’s very accurately put, yes.” We find that claimants have not sustained their burden of proving that the infant claimant sustained a post-traumatic convulsive disorder as a result of the accident of August 22, 1963. We find that claimants are not entitled to be reimbursed for the medical and hospital expense of 1964 as they relate to Dr. Kirschenbaum, Dr. Dubrow, or Beth Israel Hospital. The State’s motion to strike testimony relative to convulsive disorder, upon which we reserved decision, is granted.
We find that the infant claimant sustained the facial injuries, as detailed above, and other diagnosed injuries, in the accident of 1963; that said facial injuries required the treatment of 1963 and 1965; we find that the infant claimant will require further surgery to rectify part of the slight remaining facial disfigurement caused by the "accident of 1963; we find that the infant claimant has two, facial scars which, upon our trial observation, have faded but are still perceptible; we find that the infant claimant suffered pain as a result of this accident; and, we find that the infant claimant suffers from headaches, irritability, and forgetfulness, which are related to the accident of 1963. We find that Mr. Friedman is entitled to reimbursement for medical expenses in the sum of $2,231.53. All of these expenses were incurred prior to February 28, 1966, the date upon which the infant claimant was married. Any expenses incurred after that date would be the problem of this emancipated infant and her new husband, even though she was separated from him at the date of this trial. We find that claimants did not sustain their burden of proving any loss of services incurred by Mr. Friedman as the result of the injuries to his daughter.
The infant claimant is awarded the sum of $35,000.00. The claimant Joseph Friedman is awarded the sum of $2,231.53.