[658 NYS2d 910]

CHARLES WILLIAMS et al., Plaintiffs, and GWENDOLYN ROBBINS, Respondent, v LESLIE A. BRIGHT as Administratrix of the Estate of JESSIE J. REID, Deceased, et al., Appellants.

First Department, June 5, 1997

**APPEARANCES OF COUNSEL**

*Kathleen Peratis* of counsel *(Richard Frank, P. C.,* attorney), for respondent.

*Herbert Rubin* of counsel *(Michael Hoenig, Aaron D. Twerski, David B. Hamm* and *Miriam Skolnik* on the brief; *Herzfeld & Rubin, P. C.,* attorneys), for appellants.

*Donald T. Ridley* for Watchtower Bible and Tract Society, *amicus curiae.*

*Lois C. Waldman* on the brief *(Marc D. Stern,* attorney), for American Jewish Congress, *amicus curiae.*

**OPINION OF THE COURT**

WALLACH, J.

Plaintiff Robbins was a passenger in an automobile driven by her 70-year-old father on an upstate highway. An eyewit-

ness saw the car veer off the road at about 65 miles per hour and turn over in a culvert on adjoining farmland. There was circumstantial evidence that the driver, who had driven with this plaintiff and other family members early that morning from New York City to Plattsburgh and was returning the same day, had fallen asleep at the wheel. This was conduct that the jury found to be both negligent and a proximate cause of the accident. On this appeal, defendants, who include the lessors of the vehicle, do not seriously contest liability; the main issue is the trial court's treatment of plaintiff Robbins' alleged failure to mitigate damages due to her religious beliefs as a Jehovah's Witness.

The central question for us, on appellate review, is not merely the admeasurement of plaintiff's damages under the application of traditional tort law standards, but the broader controversy involving plaintiff's beliefs and their proper effect upon her monetary award. That, in turn, obliges us to grapple with grave constitutional issues ordinarily not involved in a motor vehicle accident—even one as tragic and catastrophic[1] as this one.

## I.

For a hundred years it has been settled law in this State that a party who claims to have suffered damage by the tort of another is bound "to use reasonable and proper efforts to make the damage as small as practicable" (*Blate v Third Ave. R. R. Co.*, 44 App Div 163, 167), and if an injured party allows the damages to be unnecessarily enhanced, the incurred loss justly falls upon him (*Hamilton v McPherson*, 28 NY 72, 77).

Plaintiff Robbins suffered a severely damaged left hip, as well as a painful injury to her right knee. Her own expert testified that if these injuries were not alleviated by well-recognized and universally accepted surgical procedures, her prognosis was for a wheelchair-bound life because of the inevitability of necrotic development in the bone structure of these limbs. Moreover, all the experts agreed that the surgical intervention available to this plaintiff (52 years of age at the time of the accident) offered her the prospect of a good recovery and a near normal life. However, Robbins, a devout Jehovah's Witness,

---

1. In addition to her own grievous injuries, plaintiff Robbins lost both her parents in the accident. Her niece's husband was rendered paraplegic, and settled during trial for $7.5 million.

presented proof (chiefly from her own hospital records) that she was obliged to refuse these recommended surgeries because her church prohibits the blood transfusions they would necessarily entail.

In accordance with settled law, the New York pattern jury instruction on the subject of damage mitigation refers to the actions of "a reasonably prudent person" (PJI 2:325) and measures the duty to mitigate in accordance with that standard.[2] Although the trial court acquainted the jury with the existence of that standard, it charged that in this case the standard to be applied was something very different:

"You have to accept as a given that the dictates of her religion forbid blood transfusions.

"And so you have to determine * * * whether she * * * *acted reasonably as a Jehovah's Witness* in refusing surgery which would involve blood transfusions.

"Was it reasonable for her, not what you would do or your friends or family, *was it reasonable for her given her beliefs*, without questioning the validity or the propriety of her beliefs?" (Emphasis added.)

In abandoning the "reasonably prudent person" test in favor of a "reasonable Jehovah's Witness" standard, over defendants' objection, the trial court perceived the issue as involving this plaintiff's fundamental right to the free exercise of her religion, protected by the First Amendment of the United States Constitution and article I (§ 3) of the New York State Constitution (167 Misc 2d 312). The First Amendment prohibits any law "respecting an establishment of religion, or prohibiting the free exercise thereof". Essentially, the court held that if the jury were permitted to assess this plaintiff's refusal to accept additional surgery without total deference to her religious beliefs, it would unlawfully restrain "the free exercise" of her Jehovah's Witness faith and would thus be constitutionally prohibited. In effect, this plaintiff's religious beliefs were held, as a matter of law, to relieve her of any legal obligation to mitigate damages under the same standard required of all other

2. "A person who has been injured is not permitted to recover for damages that could have been avoided by using means which a reasonably prudent person would have used to (cure the injury, alleviate the pain). * * * If you find that the plaintiff is entitled to recover in this action, then in deciding the nature and permanence of (his, her) injury and what damages (he, she) may recover for the injury, you must decide whether in refusing to have an operation the plaintiff acted as a reasonably prudent person would have acted under the circumstances." *(Ibid.)*

persons similarly situated who do not share similar religious convictions.

Prior to this action, New York courts have rarely dealt with the issue of a plaintiff whose medical care was limited by her religious beliefs. Virtually all of the handful of jurisdictions to have considered the question have adopted the test of the reasonably prudent person instead of the formulation employed here. (*See, e.g., Munn v Algee,* 924 F2d 568 [5th Cir], *cert denied* 502 US 900; *Corlett v Caserta,* 204 Ill App 3d 403, 413-414, 562 NE2d 257, 263; *Shorter v Drury,* 103 Wash 2d 645, 659, 695 P2d 116, 124, *cert denied* 474 US 827; *see also, Nashert & Sons v McCann,* 460 P2d 941 [Okla].)

In our view, the analysis of the trial court contained many flaws. The first error was in defining the fundamental issue as whether any jury verdict could be permitted to conflict with this plaintiff's "religious belief that it may be better to suffer present pain than to be barred from entering the Kingdom of Heaven" (167 Misc 2d, *supra,* at 318).[3] With all due deference, this is not the question that should have been presented; to put it in this manner inevitably skews the result.[4]

No one suggests that the State, or, for that matter, anyone else, has the right to interfere with that religious belief. But the real issue here is whether the consequences of that belief must be fully paid for here on earth by someone other than the injured believer. According to the trial court, the State has little interest in enforcing its general rule of damage mitigation simply to rescue a wrongdoer from the full consequences of his tortious conduct. This simplistic formulation has little application to the realities of this case. Here, the "wrongdoer," who fell asleep at the wheel, paid for his "fault" with his life. The respondents in damages (defendant car leasing company and its insurance carrier) must answer for the harm under the derivative liability imposed by Vehicle and Traffic Law § 388, which expresses the State's interest in cost allocation among

---

3. The dissent finds this quotation from the Trial Justice's opinion "misleading," although resort to the Official State Law Reports leaves us hard pressed to imagine how this citation could be confused with the jury instruction quoted verbatim earlier. The confusion, if any, lies somewhere else.

4. A second error, although not central to the focus of this analysis, was in the trial court's effort to extend the application of the "eggshell skull" doctrine—traditionally limited to a plaintiff's preexisting physical condition (*Munn v Algee, supra,* 924 F2d, at 576), mental illness (*Bartolone v Jeckovich,* 103 AD2d 632, 634) or psychological disability (*Matter of Tobin v Steisel,* 64 NY2d 254, 259)—to include this plaintiff's religious beliefs.

that segment of the public that pays automobile insurance premiums.

Of course, the State does not have any interest in the question of who wins this lawsuit, or the extent to which one party prevails over the other. But the State *does* have a compelling interest in assuring that the proceedings before its civil tribunals are fair, and that any litigant is not improperly advantaged or disadvantaged by adherence to a particular set of religious principles. The State also has a compelling interest, by constitutional command under the Fourteenth Amendment, to extend equal protection of the law to every person haled before its courts. A derivative tortfeasor is certainly entitled to no less equal protection, in this regard, than an individual under criminal indictment.

Under the Religious Freedom Restoration Act of 1993 (42 USC § 2000bb-1), a State's effort to impose a substantial burden upon an individual's free exercise of religion may only be justified in the presence of a compelling governmental interest. For example, a State's interest in establishing eligibility rules for unemployment compensation cannot justify forcing a Sabbatarian applicant to accept work on her day of rest (*Sherbert v Verner*, 374 US 398), or requiring Amish children to attend public school in contravention of their religious tenets and practice (*Wisconsin v Yoder*, 406 US 205).

An order emanating from a State court constitutes "state action" which, under the Fourteenth Amendment, would trigger First Amendment protections (*Cohen v Cowles Media Co.*, 501 US 663, 668). The trial court's instruction to the jurors on mitigation directed them to pass upon the reasonableness of plaintiff Robbins' objection, on religious grounds, to a blood transfusion. The fallacy in this instruction was that the jury never received any evidence pertaining to the rationale of her religious convictions, nor how universally accepted they may have been by members of her faith. True, there were entries in her medical records that she refused blood transfusions because she was a Jehovah's Witness, and there was brief testimony (in the context of presenting her diminished physical capabilities) that she attended Jehovah's Witness prayer services. But there was no evidence of the basis for the religious prohibition of blood transfusions. The charge thus created a sham inquiry; instead of framing an issue on how plaintiff Robbins' religious beliefs impacted on mitigation, the court foreclosed the issue in her favor without any supporting evidence. Let us recall, the jurors were told that they must ask themselves whether

this plaintiff's refusal to accept a blood transfusion was reasonable, "given her beliefs, *without questioning the validity*" of those beliefs (emphasis added). Having thus removed from the jury's consideration any question as to the validity (that is to say, the reasonableness) of plaintiff Robbins' religious convictions, the court effectively directed a verdict on the issue.

Of course, the alternative—the receipt of "expert" testimony on this subject—presents an even worse prospect. Such evidence, if any conflict developed, would present a triable issue as to whether the conviction against transfusions was heretical—or orthodox[5]—within the Jehovah's Witness faith.

The State may not endorse religion or any particular religious practice (*Lamb's Chapel v Center Moriches Union Free School Dist.*, 508 US 384). The trial court, in accepting the sincerity of plaintiff Robbins' beliefs as a given and asking the jury to consider the reasonableness of her actions only in the context of her own religion, effectively provided government endorsement to those beliefs. American courts have no business endorsing or condemning the truth or falsity of anyone's religious beliefs. The admonition delivered by Justice Douglas more than a half century ago, in *United States v Ballard* (322 US 78, 86-87), bears repeating: "Freedom of thought, which includes freedom of religious belief * * * embraces the right to maintain theories of life and of death and of the hereafter which are rank heresy to followers of the orthodox faiths. Heresy trials are foreign to our Constitution. Men may believe what they cannot prove. They may not be put to the proof of their religious doctrines or beliefs. * * * [I]f those doctrines are subject to trial before a jury charged with finding their truth or falsity, then the same can be done with the religious beliefs of any sect. When the triers of fact undertake that task, they enter a forbidden domain".[6]

---

5. I.e., "reasonable."
6. Aside from the usefulness of Justice Douglas' obiter dictum in defining this "forbidden domain," we cannot agree with the dissent's position that the Trial Judge's charge should be upheld as "more favorable to the defendants than the opinion and holding in *United States v Ballard*". The defendants in this Federal mail fraud prosecution had distributed, among other things, writings referring to their personal meetings with—and dictated instructions received from—Jesus and Saint Germain. The trial court advised the jury that the issue for determination would not be whether those dubious events had actually occurred, but whether the defendants believed, in good faith, that they had occurred. The jury instruction, approved by the Supreme Court majority, was addressed to whether or not the Ballards had the

Even under the three-pronged formula of *Lemon v Kurtzman* (403 US 602, 612-613),[7] this State action by the trial court impermissibly entered the "forbidden domain." Under that test, a challenged governmental action, in order to pass constitutional muster, must have a secular purpose, its principal or primary purpose may not advance or inhibit religion, and it may not foster excessive entanglement with religion. No secular court can decide—or, for that matter, lead a jury to decide—what is the reasonable practice of a particular religion without setting itself up as an ecclesiastical authority, and thus entangling it excessively in religious matters, in clear violation of the First Amendment. In *Kirk v Cisler* (244 App Div 733), which also involved personal injuries stemming from an automobile accident, the Second Department cautioned against permitting the tenets of a particular religion to "creep into the trial" in a manner which might invite a personal issue between a party and the jury.

An extraordinary example of the perils of such an excursion is the recent Minnesota case of *Lundman v McKown* (530 NW2d 807, 828, *cert denied* — US —, 116 S Ct 828), where damages were awarded against a Christian Scientist stepfather who blocked conventional treatment that, to a medical certainty, would have saved a young child's life.[8] Here was a healthy 11-year-old boy who succumbed to a sudden onset of juvenile diabetes, a disease that is easily diagnosable and treatable by conventional medical practice. Instead, his mother and stepfather enlisted the services of Christian Science practitioners who provided only "spiritual treatment." The child's condition deteriorated rapidly, and he died three days later. There was evidence that a shot of insulin administered as late as two hours before death could have saved him. A wrongful death action was commenced by the child's natural father and older sister against the mother and stepfather, the various

requisite mens rea to support a criminal conviction. Such an element of mail fraud has little relevance to the principles of tort law at stake here.

7. The viability of the *Lemon* test may be under challenge today (*see, Gaylor v United States*, 74 F3d 214, 216-217 [10th Cir], *cert denied* — US —, 116 S Ct 1830), supplanted by the more general test of whether the State action endorses religion or a particular religious practice (*Lamb's Chapel v Center Moriches Union Free School Dist.*, *supra*), although our Court of Appeals continues to cite it with approval (*Grumet v Cuomo*, 90 NY2d 57; *Matter of Griffin v Coughlin*, 88 NY2d 674, 690, *cert denied* — US —, 117 S Ct 681).

8. So horrendous was this result that it even led to a criminal indictment of the custodial parents for manslaughter, which was ultimately dismissed (*State v McKown*, 475 NW2d 63, *cert denied* 502 US 1036).

spiritual practitioners and the Christian Science Church itself. A jury awarded compensatory damages against all defendants in the amount of $5.2 million (reduced on posttrial motion to $1.5 million), and $9 million in punitive damages against the church.

The Minnesota Court of Appeals overturned, the verdict against the church and its officials, but upheld the portion of the award against the mother, stepfather and local practitioners. In reaching that conclusion, the appellate court allowed itself to become deeply entangled in ecclesiastical matters regarding the tenets of the Christian Science faith. The trial court, in awarding damages against the mother and stepfather, had applied the reasonable person standard of care. The Court of Appeals ruled, to the contrary, that the proper standard was that of the "reasonable Christian Scientist", but then went on to hold, as a matter of law, that a new trial was not warranted because the reasonable Christian Scientist would necessarily have concluded (as did the jury under the reasonable person standard) that the life-or-death interest of the child should have prevailed and dictated conventional medical treatment (530 NW2d, *supra,* at 828). In other words, the appellate court undertook to evaluate the reasonableness of various practices and tenets of the Christian Science faith; by doing so as a matter of law, it proceeded deep into the very "forbidden domain" about which Justice Douglas cautioned (322 US, *supra,* at 87). We should firmly decline to follow that rarely trodden and perilous path.

## II.

In espousing the objective standard and remanding this matter for a new trial, we take note of an obvious problem with strict adherence to the pattern jury instruction that is provided as a general guide *(see,* n 2, *supra).* We conclude that the unmodified application of that formulation would work an injustice in this case, as well as in others of a similar nature. It seems apparent to us that a person in plaintiff Robbins' position must be permitted to present to the jury the basis for her refusal of medical treatment; otherwise, the jury would simply be left with the fact of her refusal, without any explanation at all. Once such evidence is (as it should be) received, the court is called upon to instruct the jurors as to how such evidence should affect their deliberations. Addressing this issue, we hold that the pattern jury instruction must be supplemented here with the following direction: "In considering whether the

plaintiff acted as a reasonably prudent person, you may consider the plaintiff's testimony that she is a believer in the Jehovah's Witness faith, and that as an adherent of that faith, she cannot accept any medical treatment which requires a blood transfusion. I charge you that such belief is a factor for you to consider, together with all the other evidence you have heard, in determining whether the plaintiff acted reasonably in caring for her injuries, keeping in mind, however, that the overriding test is whether the plaintiff acted as a reasonably prudent person, under all the circumstances confronting her."

The so-called "reasonable believer" charge (Pomeroy, *Reason, Religion, and Avoidable Consequences: When Faith and the Duty to Mitigate Collide*, 67 NYU L Rev 1111, 1145-1147 [1992]) has found some support in other jurisdictions (*Lange v Hoyt*, 114 Conn 590, 159 A 575; *Christiansen v Hollings*, 44 Cal App 2d 332, 112 P2d 723). Our modification of the PJI charge is intended to strike a fair balance between the competing interests of these parties. And in pursuit of that goal, we reiterate that the court is *not* to permit the introduction of any "theological" proof, by way of either expert or lay testimony, as to the validity of religious doctrine, nor should the court issue any instructions whatsoever on that score.

### III.

■ If this matter is to be retried, two other points are worth noting. CPLR 5041 (e) states that "an annuity contract * * * will provide for the payment of the remaining amounts of future damages in periodic installments." Because of the considerable delay between the judgment we are now vacating and any future judgment recovered, the trial court should be left with some discretion to make an immediate lump-sum award, to be deducted from any annuity awarded. The trial court did not err in this respect.

■ We also hold that the missing witness charge sought by defendants was properly denied by the trial court. The physician's testimony would have been cumulative, inasmuch as all of his records had already been placed in evidence (*Diorio v Scala*, 183 AD2d 1065, 1067; *Kane v Linsky*, 156 AD2d 333).

In view of the foregoing disposition, we find it unnecessary to reach the other contentions of the parties.

Accordingly, the judgment of Supreme Court, New York County (Edward Greenfield, J.), entered November 13, 1995, which, after a jury verdict, awarded plaintiff Robbins damages

for her personal injuries structured in accordance with CPLR article 50-B, should be reversed, on the law and the facts, without costs, and the matter remanded for new trial on damages alone.

ROSENBERGER, J. P. (dissenting). I respectfully dissent and would affirm the judgment appealed. The Trial Judge charged the jury in a manner more favorable to the defendants than the opinion and holding in *United States v Ballard* (322 US 78), quoted and cited by the majority, would require.

*Ballard* involved a mail fraud prosecution in which the defendants allegedly misrepresented certain religious beliefs as part of a fraudulent scheme to sell memberships and literature and to solicit donations. The trial court recognized that it would be a violation of the Establishment Clause of the First Amendment to factor the reasonableness of religious beliefs in the legal determination of whether or not the defendants had been proven guilty. It, therefore, instructed the jurors that they were only to inquire whether the defendants " 'honestly and in good faith believe[d]' " what they preached in determining whether they were guilty or not (*supra,* at 81). If they found that the defendants had a good-faith belief in what they espoused, they were not to go on to consider the reasonableness or validity of that belief. This instruction was upheld upon First Amendment scrutiny by the United States Supreme Court (*supra,* at 88).

The majority, in a footnote, states that the Court in *Ballard (supra)* dealt only with the issue of mens rea in a criminal case. I, of course, see the issue quite differently.

The trial court advised the jury as follows: " 'The issue is: Did these defendants honestly and in good faith believe those things? If they did, they should be acquitted. I cannot make it any clearer than that.' " (*Supra,* at 81.)

The trial court emphasized the same theme in the jury charge: " 'The question of the defendants' good faith is the cardinal question in this case. You are not to be concerned with the religious belief of the defendants, or any of them. The jury will be called upon to pass on the question of whether or not the defendants honestly and in good faith believed the representations which are set forth in the indictment, and honestly and in good faith believed that the benefits which they represented would flow from their belief to those who embraced and followed their teachings, or whether these representations were mere pretenses without honest belief on

the part of the defendants or any of them, and, were the representations made for the purpose of procuring money, and were the mails used for this purpose.' " (*Supra,* at 82.)

The issue of mens rea is not discussed by the Supreme Court. The issue of religious liberty, as protected by the United States Constitution, is.. It is of this issue, the only one addressed by the Court, that it said: "The case is here on a petition for a writ of certiorari which we granted because of the importance of the question presented." (*Supra,* at 83.)

Although the majority writes that that issue "has little relevance to the principles of tort law at stake here", I am unaware of any doctrine or holding which limits the application of the First Amendment to the United States Constitution to criminal law. Basic principles of constitutional law do not change depending upon whether the context of a case is civil or criminal.

Although the issue of religion enters this case in the context of the plaintiff's duty to mitigate damages, the trial court used language to obviate a constitutional violation in the instructions here under review. The pattern jury instruction as to the legal doctrine of avoidable consequences, or the duty to undertake reasonable efforts to minimize consequential damages, though neutral on its face, would have been discriminatory as applied to a practicing Jehovah's Witness whose religion forbids the acceptance of blood transfusions (*see, Church of Lukumi Babalu Aye v City of Hialeah,* 508 US 520, 546 [discussing formal and substantive neutrality]).

The trial court's adapted charge reveals that it appropriately created an instruction that meets the State's interest in minimizing tort damages to those reasonably incurred, in the situation of an incidental burden placed upon plaintiff's practice of her religious beliefs as a Jehovah's Witness (*see, United States v Ballard, supra; see also, Sherbert v Verner* [374 US 398] and *Wisconsin v Yoder* [406 US 205], strict scrutiny test to be applied to rules that burden religious freedom). As relevant, the court's charge stated:

"Now, in making your determination as to whether [plaintiff] has acted reasonably to mitigate damage, I will instruct you that under no circumstances are you to consider the validity or reasonableness of her religious beliefs. * * *

"[W]e cannot have a situation in which jurors in passing on the reasonableness of somebody's conduct, pass upon whether their religious beliefs are reasonable or not reasonable.

"What is reasonable for [an] adherent of one religion may appear totally unreasonable to someone who has different beliefs, but you may not pass upon the validity of anyone else's beliefs. That is out of bounds for you.

"You have to accept as a given that the dictates of her religion forbid blood transfusions.

"And so you have to determine in assessing the question of damages, damages past and damages future, whether she, Mrs. Robbins, acted reasonably as a Jehovah's Witness in refusing surgery which would involve blood transfusions.

"Was it reasonable for her, not what you would do or your friends or family, was it reasonable for her given her beliefs, without questioning the validity or propriety of her beliefs."

The charge in this case did not take the issue of whether Mrs. Robbins acted reasonably away from the jury. The Trial Judge instructed this jury at least five times that whether she acted reasonably in refusing surgery was a matter to be decided by them. In doing so, the court gave an instruction more favorable to the defendants than was proper under the standard set forth by the Supreme Court of the United States in *United States v Ballard (supra)*.

The sincerity and good faith of the plaintiff's beliefs were not contested at trial or on appeal by the defendants. Realistically, they could not have been successfully challenged. The evidence showed that she stated that she would refuse blood transfusions in conformity with her religious belief at her first contact with a physician after the accident. She maintained her resolve even upon being informed that it could cost her her life. Nonetheless, the Trial Judge in his charge instructed the jury to consider her sincerity and good faith, when he told the jurors that "from the evidence, you may or may not conclude that the observance of her religion was very important to her." There was no exception to this portion of the charge, which was in conformity with *United States v Ballard (supra)*.

The majority finds fault with the instruction that the jury "may not pass on the validity of anyone else's beliefs"; it would have the jury hear evidence and determine whether the refusal to submit to a blood transfusion was orthodox, or reasonable, within the Jehovah's Witness faith. This inquiry crosses an impermissible First Amendment Establishment Clause boundary.

As the Supreme Court has noted in *Board of Educ. v Barnette* (319 US 624, 642):

"[F]reedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order.

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

The trial court's adaptation of the pattern jury charge recited above was an appropriate accommodation of plaintiff's religious beliefs *(see,* Restatement [Second] of Torts § 918, comment *j* [1979] ["(a) person is not ordinarily required to surrender a right of substantial value in order to minimize loss"]). As Justice O'Connor noted in her concurrence in *Wallace v Jaffree* (472 US 38, 83): "The solution to the conflict between the Religion Clauses lies * * * in identifying workable limits to the government's license to promote the free exercise of religion. The text of the Free Exercise Clause speaks of laws that prohibit the free exercise of religion. On its face, the Clause is directed at government interference with free exercise. Given that concern, one can plausibly assert that government pursues Free Exercise Clause values when it lifts a government-imposed burden on the free exercise of religion. If a [rule] falls within this category, then the standard Establishment Clause test should be modified accordingly. It is disingenuous to look for a purely secular purpose when the manifest objective of a [rule] is to facilitate the free exercise of religion by lifting a government-imposed burden. Instead, the [court] should simply acknowledge that the religious purpose of such a [rule] is legitimated by the Free Exercise Clause".

The majority also questions the validity of asking "whether any jury verdict could be permitted to conflict with this plaintiff's 'religious belief that it may be better to suffer present pain than to be barred from entering the Kingdom of Heaven' ". It goes on to observe: "With all due deference, this is not the question that should have been presented; to put it in this manner inevitably skews the result." This *"question"* is not a quote from the jury charge. It is a quote from the trial court's decision upholding its instructions. It is, therefore, misleading for this Court to state that the manner of the question skewed the resulting response. This question was never put to the jury, and the manner in which the actual question was put to the jury was, as seen from the quoted portions of the charge, quite different.

The jury charge was in conformity with our tort system, allowing for an assessment of the actual situation of a victim of negligence,[1] rather than assigning a certain value to a designated injury (see, Pomeroy, *Reason, Religion, and Avoidable Consequences: When Faith and the Duty to Mitigate Collide*, 67 NYU L Rev 1111, 1131 ["A long line of common-law precedents establish the 'individualized', subjective character of (the doctrine of avoidable consequences)"]). The concept of the "eggshell plaintiff" has not been limited to physical infirmities (*Bartolone v Jeckovich*, 103 AD2d 632; see also, *Matter of Tobin v Steisel*, 64 NY2d 254, 259).

As the majority opinion has emphasized, the monetary damages to plaintiff will be paid, not by the deceased tortfeasor, but by an insurance carrier. This observation, carried to its logical extension, would substantially diminish the concept linking fault and monetary responsibility for damages in most tort claims. Be that as it may, the danger that the cost of such accidents, borne by insurance carriers, would be passed on to the general public in the form of greater premiums is unsupported by data evincing a high frequency of religious refusals to accept certain medical care. In fact, one commentator has come to the conclusion that this type of case "is sufficiently rare that [the] hypothetical costs [posed] to society [are] negligible" (Pomeroy, *op. cit.*, at 1140).

In sum, to have the leasing company and insurance carrier reimburse this plaintiff for the loss she has suffered is in accord with First Amendment requirements[2] that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof", which applies to both State legislative and judicial action (see, *National Assn. for Advancement of Colored People v Alabama*, 357 US 449, 463). It is also in conformity with the more broadly drafted article I (§ 3) of the New York Constitution, which guarantees all State citizens "free exercise and enjoyment of religious profession and worship, without discrimination or preference"; as well as article I (§ 11), which directs that "[n]o person shall, because of * * * creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation,

---

1. *See, Friedman v State of New York*, 54 Misc 2d 448, *mod on other grounds* 31 AD2d 992 (orthodox Jewish woman not contributorily negligent for jumping out of a negligently abandoned chairlift rather than remaining after dark with a man to whom she was not married).

2. The First Amendment is made applicable to the States through the Fourteenth Amendment (*Cantwell v Connecticut*, 310 US 296).

or institution, or by the state or any agency or subdivision of the state."

This plaintiff should not be subjected to the intrusiveness and indignity of having the reasonableness of her religious beliefs examined and determined by a jury. This basic protection is afforded her by not one, but two constitutions.

Motion seeking leave to file *amicus curiae* brief on behalf of American Jewish Congress granted.

NARDELLI and TOM, JJ., concur with WALLACH, J.; ROSENBERGER, J. P., dissents in a separate opinion.

Judgment of Supreme Court, New York County, entered November 13, 1995, reversed, on the law and the facts, without costs, and the matter remanded for new trial on damages alone. Motion seeking leave to file *amicus curiae* brief on behalf of American Jewish Congress granted.