BRAVERMAN v GRANGER

Docket No. 309528. Submitted December 11, 2013, at Detroit. Decided
January 9, 2014, at 9:00 a.m. Leave to appeal sought.

Eric Braverman, personal representative of the estate of Gwendolyn
Rozier, brought a wrongful-death action in the Macomb Circuit
Court against Darla Kae Granger, M.D., and others, alleging
medical malpractice. Rozier, a Jehovah's Witness, was discharged
from the hospital after receiving a kidney transplant. She returned
to the hospital several days later complaining of abdominal pain.
Rozier's physicians suspected an antibody-mediated rejection of
the kidney and conducted a biopsy of the renal graft, which
confirmed the presence of antibody-mediated vascular rejection.
Rozier's physicians began treatment to try to save the kidney.
After subsequent tests indicated the possibility of internal bleed-
ing, Rozier was rushed to the operating room for emergency
surgery. Rozier's husband was advised that she needed a blood
transfusion, but he refused consent for the transfusion in accor-
dance with Rozier's previously stated desires. Rozier died the
following day. Plaintiff alleged various breaches of the standard of
care, including improper prescription of various blood-thinning
medications and daily plasmapheresis, and a failure to timely
diagnose the internal bleeding. According to plaintiff, these
breaches of the standard of care caused Rozier's fatal predicament
because but for the negligence, a decision concerning the accep-
tance of a blood transfusion would not have been needed. Defen-
dants moved for summary disposition, arguing that they were not
liable for wrongful-death damages under the doctrine of avoidable
consequences. In response, plaintiff argued that application of the
doctrine would violate the Free Exercise and Establishment
Clauses of the First Amendment by hindering the exercise of the
tenets of the Jehovah's Witness religion and by allowing a jury to
consider the reasonableness of the Jehovah's Witness religion,
respectively. The Court, David F. Viviano, J., granted summary
disposition in favor of defendants. Plaintiff appealed.

The Court of Appeals held:

The doctrine of avoidable consequences, which includes the
principle of mitigation of damages, is a common-law doctrine. It

prevents parties from recovering damages that could have been avoided by reasonable effort. Under the First Amendment, although a court or jury may inquire into whether a religious belief is sincere or genuine, it should not decide the truth or reasonableness of the belief. To avoid running afoul of the First Amendment, an objective approach—which eliminates from consideration all subjective reasons for failing to mitigate and, thus, only incidentally burdens religious beliefs—must be used when determining whether the doctrine of avoidable consequences bars recovery. The proper inquiry is whether the medical treatment was an objectively reasonable means to avoid or minimize damages following the person's original injury given the circumstances of the case, circumstances that may include the gravity of the original injury, the intrusiveness of the proposed medical treatment and the risk of complications, the feasibility of alternative medical treatments, the expense of the proposed medical treatment, and the increased likelihood of recovery if the proposed medical treatment had been accepted by the patient. If the medical treatment was an objectively reasonable means of avoiding or minimizing damages, then the refusal to accept the medical treatment means the individual unreasonably failed to mitigate his or her damages. In this case, there was no genuine issue of material fact that the blood transfusion was a reasonable procedure to minimize damages following Rozier's injury. The trial court did not err by concluding that the doctrine of avoidable consequences barred plaintiff from recovering damages for Rozier's death.

Affirmed.

BOONSTRA, P.J., concurring, wrote separately to emphasize that Rozier chose to refuse a blood transfusion that likely would have saved her life, that she bore responsibility for the consequences that flowed from that choice regardless of the reason for her choice, and that the Court's opinion should not be interpreted as reflective of any viewpoint regarding religion generally or any particular religious belief or expression.

TORTS — MEDICAL MALPRACTICE — AVOIDABLE CONSEQUENCES — RELIGIOUS BELIEFS.

To avoid running afoul of the First Amendment in a medical-malpractice case in which the patient refused a recommended treatment because of religious beliefs, an objective approach—which eliminates from consideration all subjective reasons for failing to mitigate—must be used when determining whether the doctrine of avoidable consequences bars recovery; the proper inquiry is whether the medical treatment was an objectively

reasonable means to avoid or minimize damages following the person's original injury given the circumstances of the case— circumstances that may include the gravity of the original injury, the intrusiveness of the proposed medical treatment and the risk of complications, the feasibility of alternative medical treatments, the expense of the proposed medical treatment, and the increased likelihood of recovery if the proposed medical treatment had been accepted by the patient; if the medical treatment was an objectively reasonable means of avoiding or minimizing damages, then the refusal to accept the medical treatment means the individual unreasonably failed to mitigate his or her damages.

*Allan Falk, PC* (by *Allan Falk*), for Eric Braverman.

*Kitch Drutchas Wagner Valitutti & Sherbrook* (by *Susan Healy Zitterman, Anthony G. Arnone*, and *Cheryl A. Cardelli*) for Darla K. Granger, Heung K. Oh, Ivan G. Olarte, St. John Hospital and Medical Center, and St. John Health.

*Kerr, Russell & Weber, PLC* (by *Joanne Geha Swanson*), for Robert Provenzano, Mohamed A. El-Ghoroury, and St. Clair Specialty Physicians.

Before: BOONSTRA, P.J., and DONOFRIO and BECKERING, JJ.

PER CURIAM. This medical-malpractice case ultimately requires an answer to the following question: Who must bear the legal burden for the death of Gwendolyn Rozier when Rozier, because of her religious convictions, refused to accept a blood transfusion that likely would have saved her life, but Rozier's doctors, through their assumed breach of the applicable standard of care and acting with knowledge of her religious convictions, placed Rozier in the position to need the blood transfusion? This is a difficult case because of both the complex legal issues this question presents and the tragic loss incurred by Rozier's family.

The trial court concluded that plaintiff, Eric Braverman, as personal representative of the Estate of Gwendolyn Rozier, is barred as a matter of law by the doctrine of avoidable consequences from recovering damages for Rozier's death. Thus, the court granted summary disposition under MCR 2.116(C)(10) in favor of defendants Darla K. Granger, M.D., Heung K. Oh, M.D., Ivan G. Olarte, M.D., St. John Hospital and Medical Center, and St. John Health (collectively the "St. John defendants"); and defendants Robert Provenzano, M.D., Mohamed A. El-Ghoroury, M.D., and St. Clair Specialty Physicians (collectively the "St. Clair defendants"). Plaintiff now appeals as of right. For reasons discussed further in this opinion, we agree with the trial court that the doctrine of avoidable consequences, when applied in a purely objective manner to comply with the First Amendment's requirement of government neutrality toward religion, precludes plaintiff from recovering damages for Rozier's death. Therefore, we affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

According to the Jehovah's Witness faith, no blood, blood product, or any derivative of any kind of blood are allowed for medical treatment. Every Jehovah's Witness consciously determines what he or she accepts in blood management. Rozier was a Jehovah's Witness and would not accept whole blood or blood products in medical treatment.

On August 15, 2007, Rozier was suffering from end-stage renal disease and received a kidney transplant at St. John Hospital. Dr. Oh and surgical resident Dr. Olarte performed the surgery. Rozier was discharged on August 18, 2007, but returned to St. John Hospital on August 24, 2007, with complaints of ab-

dominal pain.[1] She was admitted under the care of nephrologist Dr. El-Ghoroury, with transplant surgeons Drs. Granger and Oh consulting. Rozier's doctors suspected an antibody-mediated rejection of the kidney. Rozier received intravenous immune globulin (IVIG) and Solu-Medrol (steroids). A CT-guided needle biopsy of the renal graft was performed to determine whether the transplanted kidney was being rejected. According to Dr. Oh's operative report, the biopsy confirmed the presence of antibody-mediated vascular rejection. As a result, Rozier began plasmapheresis treatment with albumin solution replacement,[2] as well as the IVIG and Solu-Medrol treatment. Plaintiff contends that while plasmapheresis has been shown to be effective for removing antibodies that are presumably causing rejection of the donor organ, it is also known to affect the patient's coagulation parameters and clotting factors. A nephrologist monitors a plasmapheresis patient and decides what the coagulation parameters are and orders coagulation studies; Dr. Provenzano and Dr. El-Ghoroury were the treating nephrologists in this case.

The documentary evidence illustrates that on August 25, Rozier's hematocrit level was 41.6%, and her hemoglobin level was 13.7 grams per deciliter of blood (g/dl).[3] On August 26, Rozier's hematocrit and

---

[1] Plaintiff is not critical of the actual transplant surgery. Further, plaintiff acknowledges that there was a known risk that Rozier's body might reject the transplanted kidney because it came from her daughter, and her body could have developed antibodies during pregnancy that would cause her system to recognize the transplanted kidney as a foreign body.

[2] Plasmapheresis removes blood from the body, separates blood cells from plasma in order to filter out antibodies, and returns the blood cells to the body's circulation. The patient usually receives replacement plasma, but in a situation such as Rozier's, in which the patient refuses to accept blood products, saline solution is used.

[3] A hematocrit test determines the percentage of the volume of a blood sample taken up by cells. The test indicates whether a person has too

hemoglobin levels decreased to 33.1% and 11 g/dL, respectively. On the morning of August 28, 2007, Rozier was noted to be very pale and confused; her hematocrit level was 16.4%, and her hemoglobin level was 6.4 g/dL, which raised suspicion of internal bleeding from the transplant kidney. Rozier underwent an abdominal CT scan, which, according to Dr. Oh's report, "confirmed the presence of [a] large mass around the kidney and could explain for the drop in hemoglobin." In the report, Dr. Oh noted, "Since she is a Jehovah Witness, we were not able to replace the plasma that was removed by plasmapheresis and was [sic] able to replace only by the albumin solution so her bleeding parameters were prolonged."

Rozier was taken to the operating room immediately after the CT-scan finding. The intended procedure, risks, and complications, including bleeding from the transplant wound and possible death because of Rozier's refusal to accept any blood product, were explained to Rozier's husband, Gregory. Dr. Oh explained to Gregory that Rozier's hemoglobin was unacceptably low and that she needed a blood transfusion. Gregory responded, "Well, that's unacceptable, Dr. Oh, as you well know." The Roziers had previously discussed with Dr. Oh that they were Jehovah's Witnesses and had explained that they would not accept whole blood or whole blood products. Further, Rozier had signed a document stating that she refused to permit "blood

---

many or too few red blood cells. The normal range is 34.9% to 44.5% for women. Mayo Clinic, *Hematocrit Test* <http://www.mayoclinic.org/tests-procedures/hematocrit/basics/definition/prc-0015009?p=1>[http://perma.cc/4EDN-HQ3X] (accessed January 8, 2014). Hemoglobin is a protein in red blood cells that carries oxygen; normal results vary, but in general range between 12.1 and 15.1 g/dL for women. MedlinePlus, *Hemoglobin* http://www.nlm.nih.gov/medlineplus/ency/article/003645.htm [http://perma.cc/A2Q3-BV33] (accessed January 8, 2014).

and/or blood components to be administered[.]" Rozier consented to defendants doing anything they thought was appropriate for her, except for the "blood situation."

According to Dr. Oh's operative report, the fascia of the kidney was "found to have a large amount of blood clots, as well as fresh blood." The kidney was completely decapsulated. And the "lower pole of the kidney showed there was a small pumper from what seemed to be a biopsy site." The bleeding site was sutured. However, the fate of the transplant kidney was found to be "doomed because [they] were not able to give [Rozier] anymore treatment for vascular rejection due to her bleeding tendencies, as well as [her] refusal to receive any blood product so it was decided to remove the transplant to give her a chance to survive . . . ." The kidney transplant was removed without incident. Upon inspecting the transplant wound, there were still some clots in Rozier's retroperitoneum. Although the operation was completed and Rozier was taken to recovery, she died on August 29, 2007, at the age of 55.

On November 30, 2009, plaintiff initiated the instant medical-malpractice suit against defendants. Plaintiff alleged various breaches of the standard of care, including improper prescription of various blood-thinning medications and daily plasmapheresis,[4] and also a failure to timely recognize signs of internal bleeding. The St. John defendants moved the trial court for summary

---

[4] Plaintiff contends that while initial findings were consistent with Rozier experiencing antibody-mediated vascular rejection, the findings were inconclusive and did not rule out cell mediated rejection or a combination of both. Plaintiff argues that even if the rejection is determined to be antibody-mediated vascular rejection, the first line of treatment is IVIG and Solu-Medrol, a corticosteroid treatment, with plasmapheresis to follow only if such treatment efforts prove unsuccessful.

disposition, arguing, among other things, that the doctrine of avoidable consequences barred plaintiff's claim for wrongful-death damages. The St. Clair defendants likewise moved the trial court for summary disposition, arguing that they were not liable for wrongful-death damages arising out of Rozier's failure to mitigate. In response to defendants' mitigation argument, plaintiff argued that application of the doctrine of avoidable consequences would violate the Free Exercise and Establishment Clauses of the First Amendment by incidentally hindering a Jehovah's Witness's exercise of the tenets of her religion and allowing a jury to consider the reasonableness of the Jehovah's Witness religion, respectively. Plaintiff emphasized that defendants caused Rozier's fatal predicament because but for defendants' negligence, a decision concerning the acceptance of a blood transfusion would not have been needed.

After a hearing to address the motions, the trial court issued an opinion and order, granting defendants' motions for summary disposition under MCR 2.116(C)(10). The court opined that after "thorough research," it would use an objective standard—as opposed to a case-by-case approach that would inject religion into the case—when applying the doctrine of avoidable consequences. Relying on caselaw from the United States Court of Appeals for the Fifth Circuit, the trial court was persuaded by and adopted the view that an objective approach did not violate the First Amendment. Applying the doctrine of avoidable consequences using the objective approach, the court opined, in pertinent part, as follows:

> Rozier had a duty to exercise reasonable care to minimize her damages. . . . [I]t is uncontested that the medical procedure, *i.e.*, a blood transfusion, would have saved her life and stood a high probability of being successful had it been accepted by Ms. Rozier. Although the record indicates

genuine issues of material fact regarding whether defendants breached the standard of care by prescribing various blood thinning medications, daily plasmapheresis, and failing to timely recognize signs of internal bleeding, the record further indicates that after defendants' alleged wrongful conduct Ms. Rozier had the opportunity to mitigate her damages but instead made the decision to refuse the blood transfusion.

Under these circumstances, once Ms. Rozier's religious beliefs are removed from the equation, a reasonable trier of fact could not conclude that the refusal to accept a life-saving procedure, *i.e.*, a blood transfusion, was a reasonable choice under the objective person approach. The proposed blood transfusion was reasonable, since there were no remaining alternatives, a high probability of a positive outcome, and the transfusion was not a serious operation or medical procedure. Since it is uncontested that Ms. Rozier would have lived if she had accepted a blood transfusion, under an objective standard it was unreasonable to refuse the life-saving treatment.

The damages which plaintiff seeks to recover did not occur as a result of the personal injuries suffered by Ms. Rozier but as a result of her death, which she could have avoided with reasonable acts. Accordingly, defendants have no legal obligation to pay damages for Ms. Rozier's death because her death was avoidable and the refusal of the blood transfusion by Ms. Rozier was objectively unreasonable. [Citations omitted.]

Plaintiff moved the trial court for reconsideration, which the court denied.

### II. ANALYSIS

Plaintiff argues that the trial court erred by granting summary disposition in favor of defendants under the doctrine of avoidable consequences. We disagree.

We review the trial court's decision to grant a motion for summary disposition de novo. *Maiden v Rozwood,*

461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion brought under MCR 2.116(C)(10), this Court considers the pleadings, affidavits, depositions, admissions, and any other documentary evidence submitted by the parties in the light most favorable to the nonmoving party. *The Cadle Co v City of Kentwood*, 285 Mich App 240, 247; 776 NW2d 145 (2009). A motion for summary disposition under MCR 2.116(C)(10) may be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Campbell v Human Servs Dep't*, 286 Mich App 230, 235; 780 NW2d 586 (2009). A genuine issue of material fact exists when reasonable minds could differ on a material issue. *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

As an initial matter, plaintiff argues for the first time on appeal that the doctrine of avoidable consequences was extinguished through the abolition of contributory negligence and the adoption of comparative negligence. "Issues raised for the first time on appeal are not ordinarily subject to review." *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993). Although this issue is not properly before this Court, we will briefly address it nevertheless.

The doctrine of avoidable consequences, which includes the principle of mitigation of damages, is a common-law doctrine. See *Pulver v Dundee Cement Co*, 445 Mich 68, 78; 515 NW2d 728 (1994); *Lawrence v Will Darrah & Assoc, Inc*, 445 Mich 1, 15; 516 NW2d 43 (1994); *Shiffer v Bd of Ed of Gibraltar Sch Dist*, 393 Mich 190, 197-198; 224 NW2d 255 (1974). "The common law remains in force until 'changed, amended or repealed.'" *Velez v Tuma*, 492 Mich 1, 11; 821 NW2d

432 (2012), quoting Const 1963, art 1, § 7. "There is no
question that both [our Supreme] Court and the Legis-
lature have the constitutional power to change the
common law." *Placek v Sterling Hts*, 405 Mich 638, 656;
275 NW2d 511 (1979). However, "[w]e will not lightly
presume that the Legislature has abrogated the com-
mon law. Nor will we extend a statute by implication to
abrogate established rules of common law." *Velez*, 492
Mich at 11 (citation omitted). Absent "a contrary ex-
pression by the Legislature, well-settled common-law
principles are not to be abolished by implication . . . ."
*Marquis v Hartford Accident & Indemnity (After Re-
mand)*, 444 Mich 638, 652; 513 NW2d 799 (1994).
"Rather, the Legislature should speak in no uncertain
terms when it exercises its authority to modify the
common law." *Velez*, 492 Mich at 11-12 (citations and
quotation marks omitted).

In this case, plaintiff invites this Court to deem the
doctrine of avoidable consequences implicitly abrogated
by the adoption of comparative negligence. However,
plaintiff has demonstrated neither that the Legislature
has abrogated the doctrine "in no uncertain terms," nor
that our Supreme Court has done so expressly, see, e.g.,
*Placek*, 405 Mich at 679 (expressly replacing the doc-
trine of contributory negligence with the doctrine of
comparative negligence). Therefore, we decline to con-
clude that the doctrine of avoidable consequences has
been abrogated by the adoption of comparative negli-
gence.

Our Supreme Court has explained the doctrine of
avoidable consequences as follows:

> Where one person has committed a tort, breach of
> contract, or other legal wrong against another, it is incum-
> bent upon the latter to use such means as are reasonable
> under the circumstances to avoid or minimize the damages.

> The person wronged cannot recover for any item of damage which could thus have been avoided. [*Shiffer*, 393 Mich at 197 (citation, quotation marks, and emphasis omitted). See also *Morris v Clawson Tank Co*, 459 Mich 256, 263-264; 587 NW2d 253 (1998) (stating the same); *Talley v Courter*, 93 Mich 473, 474; 53 NW 621 (1892) ("A party against whom a trespass is committed has no right . . . by neglecting the obvious and ordinary means of preventing or lessening the damages, to make them more than they otherwise would have been . . . .").]

Thus, stated differently, the doctrine of avoidable consequences prevents parties from recovering damages that could have been avoided by reasonable effort. *Tel-Ex Plaza, Inc v Hardees Restaurants, Inc*, 76 Mich App 131, 134-135; 255 NW2d 794 (1977). This doctrine of mitigation is "designed not only to prevent and repair individual loss and injustice, but to protect and conserve the economic welfare and prosperity of the whole community." *Shiffer*, 393 Mich at 198 (citation and quotation marks omitted). The lead opinion in *Kirby v Larson*, 400 Mich 585, 617-618; 256 NW2d 400 (1977) (opinion by WILLIAMS, J.), distinguished the doctrine of avoidable consequences from the principles of contributory negligence:

> Negligence subsequent to the injury is distinguished from contributory negligence, which is negligence which contributed proximately to cause the injury. If plaintiff fails to use due care to prevent or reduce damages subsequent to the injury complained of, he or she may not recover the enhanced damages. While the amount of damages may be reduced by such action or inaction, the action itself will not be barred. Thus, this doctrine of "avoidable consequences" is distinguished from contributory negligence and, in effect limits the latter doctrine to events which cause the original injury, even though plaintiff's action or inaction in aggravating the injury may result in damage out of all proportion to the original event. [Emphasis omitted.]

In the instant case, defendants contend that reasonable efforts were not made to avoid plaintiff's damages resulting from Rozier's death because the blood transfusion recommended to save Rozier's life was refused. Thus, the dispositive question is whether the blood transfusion was an objectively reasonable means to avoid or minimize damages following Rozier's original injury given the circumstances of this case. The parties dispute whether Rozier's religion should be considered when answering this question. Defendants argue that the trial court properly abstained from considering the subjective reason for the refusal of the blood transfusion. Plaintiff argues that the trial court should have considered the fact that Rozier's religion did not permit her to accept a blood transfusion when it was determining whether a question of fact exists regarding whether Rozier failed to undertake reasonable efforts under the circumstances to avoid the damages plaintiff seeks to recover in this case. This is a complex issue with First Amendment implications.

The First Amendment of the United States Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." US Const, Am I. "The protections provided by the First Amendment . . . have been 'incorporated' and extended to the states and to their political subdivisions by the Fourteenth Amendment." *Greater Bible Way Temple of Jackson v City of Jackson*, 478 Mich 373, 379; 733 NW2d 734 (2007). The Free Exercise Clause of the First Amendment "generally prohibits governmental regulation of religious beliefs," *Weishuhn v Catholic Diocese of Lansing*, 279 Mich App 150, 157; 756 NW2d 483 (2008), whereas "[t]he Establishment Clause guarantees governmental neutrality with respect to religion and guards against excessive governmental entanglement with religion." *Id.* at 156 (citation

omitted). Under the First Amendment, although a court or jury may inquire into whether a religious belief is genuine or sincere, it should not decide the truth or reasonableness of the belief. *Dep't of Social Servs v Emmanuel Baptist Preschool*, 434 Mich 380, 392-393; 455 NW2d 1 (1990); *United States v Ballard*, 322 US 78, 84-88; 64 S Ct 882; 88 L Ed 1148 (1944).

There is no binding authority in Michigan addressing the application of the doctrine of avoidable consequences in the context of a patient's refusal of lifesaving medical treatment and the interplay of the religion clauses of the First Amendment. However, there are a limited number of cases from other jurisdictions that address the issue. See, generally, Anno: *Refusal of Medical Treatment on Religious Grounds*, 3 ALR5th 721, 727-745, §§ 2-9.

In *Munn v Algee*, 924 F2d 568, 574-575 (CA 5, 1991), the United States Court of Appeals for the Fifth Circuit addressed whether an "objective approach," which does not consider religion as a factor, or a "case-by-case approach," which permits consideration of a plaintiff's religious beliefs, should be used when determining whether a plaintiff failed to mitigate damages. In *Munn*, the plaintiff, Ray Munn, and his wife, Elaine Munn were involved in a car accident with the defendant. *Id.* at 570-571. Elaine was taken to a hospital to receive treatment for a variety of injuries, but her condition deteriorated. *Id.* at 571. She died after she refused to accept a blood transfusion because she was a Jehovah's Witness. *Id.* The defendant asserted that the doctrine of avoidable consequences precluded an award of damages for Elaine's death. The trial court used the case-by-case approach, and a jury concluded that Elaine would not have died had she accepted the blood trans-

fusion and, therefore, awarded no damages on the plaintiff's wrongful-death claim. *Id.* at 571.

On appeal, the plaintiff argued that the application of the doctrine of avoidable consequences violated the Free Exercise and Establishment Clauses of the First Amendment by burdening his wife's exercise of the Jehovah's Witness faith and inviting the jury to consider the reasonableness of her religious beliefs. *Id.* at 574. The Fifth Circuit held that the application of the case-by-case approach would arguably violate the Establishment Clause but was nevertheless harmless error in the case before it. *Id.* at 574-575. The court determined that application of the doctrine did not violate the Free Exercise Clause under either the objective or the case-by-case approach because "generally applicable rules imposing incidental burdens on particular religions do not violate the free exercise clause." *Id.* at 574. The court emphasized that "[t]he more compelling problem with the application of the doctrine in this case is that it potentially invited the jury to judge the reasonableness of the Jehovah's Witnesses' religion." *Id.* The court explained the constitutional problem as follows:

Application of the case-by-case approach allows a jury to consider the religious nature of a plaintiff's refusal to avoid the consequences of a defendant's negligence. Accordingly, otherwise unreasonable conduct may be deemed reasonable. However, the question of whether a jury decides to label such conduct as reasonable may depend upon its view of the religious tenet that motivated the plaintiff's failure to mitigate damages.

If the jury finds the religion plausible, it will more likely deem the conduct reasonable; on the other hand, if the particular faith strikes the jury as strange or bizarre, the jury will probably conclude that the plaintiff's failure to mitigate was unreasonable. *Because the plaintiff's religion*

*is the only basis upon which otherwise unreasonable con-
duct can be deemed reasonable, the jury undoubtedly as-
sesses the plaintiff's religion in reaching its conclusion.* A
strong case can be made that the first amendment forbids
such an assessment. [*Id.* at 575 (citation omitted; emphasis
added).]

Notwithstanding the constitutional problem, the court
concluded that application of the case-by-case approach
was harmless error. *Id.* The court explained that the
plaintiff injected religion into the case; had the court
prohibited the plaintiff from doing so (through the
application of the objective standard), the jury would
have undoubtedly deemed Elaine's refusal of the blood
transfusion unreasonable; therefore, the jury's assess-
ment of Elaine's religion did not harm the plaintiff's
case. *Id.* The court encouraged trial courts to apply the
objective standard in the future to religiously motivated
refusals to mitigate damages because the approach does
not violate the Free Exercise or Establishment Clauses
of the United States Constitution.[5] *Id.* at 575 n 12.

In *Williams v Bright*, 230 AD2d 548, 556; 658 NYS2d
910 (1997), a New York appellate court took a different
stance on the issue of what standard to apply than the
court did in *Munn*, concluding that a plaintiff must be

_____

[5] It is noteworthy that the court also considered the propriety of the
trial court's instruction to the jury that in determining whether the
refusal of the blood transfusion was reasonable, the jury could consider
Elaine's " 'religious beliefs and related teachings, . . . if you find that to
be a factor in her decision.' " *Munn*, 924 F2d at 578. The court concluded
that the instruction, while not purely objective because it permitted the
jury to consider Elaine's religious beliefs, comported with state law that
permitted courts to consider personal attributes in determining reason-
ableness. *Id.* at 579. However, the court emphasized that the state's law
allowing the jury to consider personal attributes when determining
reasonableness "does not in any way undermine our observation that
jury consideration of religious beliefs may violate" the Establishment
Clause. *Id.* at 579 n 20.

permitted to present to a jury the basis for the refusal of medical treatment. As in *Munn*, *Williams* involved the alleged failure of a Jehovah's Witness to mitigate damages by refusing a recommended blood transfusion for religious reasons. *Id.* at 550-551. The issue in *Williams* focused on the propriety of the following jury instruction regarding mitigation of damages, which the trial court provided to the jury after acquainting the jury with the existence of New York's pattern jury instruction regarding mitigation, which refers to the actions of a "reasonably prudent person":

> You have to accept as a given that the dictates of her religion forbid blood transfusions.
>
> And so you have to determine . . . whether she . . . *acted reasonably as a Jehovah's Witness* in refusing surgery which would involve blood transfusions.
>
> Was it reasonable for her, not what you would do or your friends or family, *was it reasonable for her given her beliefs,* without questioning the validity or the propriety of her beliefs? [*Id.* at 551 (quotation marks omitted).]

The appellate court held that this jury instruction constituted government endorsement of the Jehovah's Witness faith in violation of the First Amendment. *Id.* at 553-554. The court explained that "[t]he trial court, in accepting the sincerity of [the plaintiff's] beliefs as a given and asking the jury to consider the reasonableness of her actions only in the context of her own religion, effectively provided government endorsement to those beliefs." *Id.* at 554. "No secular court can decide—or, for that matter, lead a jury to decide—what is the reasonable practice of a particular religion without setting itself up as an ecclesiastical authority, and thus entangling it excessively in religious matters, in clear violation of the First Amendment." *Id.* at 555. The appellate court opined that the plaintiff's religious

beliefs were "held, as a matter of law, to relieve her of any legal obligation to mitigate damages under the same standard required of all other persons similarly situated who do not share similar religious convictions." *Id.* at 551-552.

In determining the proper jury instruction to be used on remand, the appellate court first noted that "[v]irtually all of the handful of jurisdictions to have considered the question have adopted the test of the reasonably prudent person instead of the formulation employed here." *Id.* at 552, citing *Munn*, 924 F2d 568; *Corlett v Caserta*, 204 Ill App 3d 403, 413-414; 149 Ill Dec 793; 562 NE2d 257 (1990); *Shorter v Drury*, 103 Wash 2d 645, 659; 695 P2d 116 (1985); *Nashert & Sons v McCann*, 460 P2d 941 (Okla, 1969). However, the court opined that strict adherence to an objective standard without allowing consideration of the basis for the refusal of medical treatment would work an injustice in cases in which the refusal was on religious grounds; the court believed that a jury should not be left with the fact of a patient's refusal without any explanation at all. *Id.* at 556. Thus, the court adopted what it described as a "reasonable believer" charge, and held that the trial court on remand should employ the following instruction to "strike a fair balance between the competing interests of [the] parties":

"In considering whether the plaintiff acted as a reasonably prudent person, you may consider the plaintiff's testimony that she is a believer in the Jehovah's Witness faith, and that as an adherent of that faith, she cannot accept any medical treatment which requires a blood transfusion. I charge you that such belief is a factor for you to consider, together with all the other evidence you have heard, in determining whether the plaintiff acted reasonably in caring for her injuries, keeping in mind, however, that the overriding test is whether the plaintiff acted as a

reasonably prudent person, under all the circumstances confronting her." [*Id.* at 556-557.]

The appellate court emphasized that the trial court was "*not* to permit the introduction of any 'theological' proof, by way of either expert or lay testimony, as to the validity of religious doctrine, nor should the court issue any instructions whatsoever on that score." *Id.* at 557. The court noted that its supplemented instruction "has found some support in other jurisdictions." *Id.*, citing *Lange v Hoyt*, 114 Conn 590; 159 A 575 (1932); *Christiansen v Hollings*, 44 Cal App 2d 332; 112 P2d 723 (1941).

While we respect and appreciate the desire to strike a balance between the competing interests of the parties in a situation such as this, we find *Williams* to be flawed in that it inescapably entails a jury's assessment of the reasonableness of one's religious beliefs. We conclude that the adoption of a purely objective approach—which eliminates from consideration all subjective reasons and, thus, only incidentally burdens religious beliefs—is the only way to avoid running afoul of the First Amendment. Under the reasonable believer or case-by-case approach, if a trier of fact is asked to determine whether a blood transfusion was a reasonable means for a person to avoid death in circumstances in which the person's religious beliefs prohibit him or her from accepting the blood transfusion, the trier of fact will necessarily be required to judge either the reasonableness of the tenets of the person's religion or the reasonableness of the person's decision to abide by his or her religious beliefs in the face of death. Judging religion and the practice of that religion cannot be extricated from the process. If the trier of fact finds the religious prohibition of the blood transfusion to be reasonable, he or she will more likely deem the refusal

of the blood transfusion reasonable under the circumstances because the person's religion reasonably prohibits it; however, if the religious prohibition of the blood transfusion strikes the trier of fact as unreasonable, he or she will likely conclude that the refusal of the blood transfusion was unreasonable under the circumstances because the person's religion unreasonably prohibits it. See, generally, *Munn*, 924 F2d at 575. That approach would "foster an excessive government entanglement with religion" by permitting a court or jury to inquire into the truth or reasonableness of a religious belief. *Scalise v Boy Scouts of America*, 265 Mich App 1, 11-12; 692 NW2d 858 (2005) (quotation marks and citation omitted). See also *Emmanuel Baptist Preschool*, 434 Mich at 392; *Lemon v Kurtzman*, 403 US 602, 612-613; 91 S Ct 2105; 29 L Ed 2d 745 (1971); *Ballard*, 322 US at 84-88.

The purely objective approach, employed by the trial court in this case and recommended in *Munn*, does not suffer the same constitutional shortcoming. Under the objective approach, the proper inquiry is not whether the person's subjective reasons for refusing the transfusion were reasonable. Rather, the proper inquiry is whether the blood transfusion was an objectively reasonable means to avoid or minimize damages following the person's original injury given the circumstances of the case, circumstances that may include the gravity of the original injury, the intrusiveness of the proposed medical treatment and the risk of complications, the feasibility of alternative medical treatments, the expense of the proposed medical treatment, and the increased likelihood of recovery if the proposed medical treatment had been accepted by the patient. See generally *Corlett*, 204 Ill App 3d at 413-414. If the blood transfusion was an objectively reasonable means of avoiding or minimizing damages, then the refusal to

accept the transfusion means the individual unreasonably failed to mitigate his or her damages. This is a neutral approach that does not treat anyone disparately because it eliminates all subjective factors[6] from consideration, not just religion.

Applying the objective standard to the instant case, we conclude that there is no genuine issue of material fact that the blood transfusion was a reasonable procedure to minimize damages following Rozier's original injury under the circumstances of this case. The documentary evidence illustrates that after the biopsy and the initiation of plasmapheresis, there were strong indications that Rozier began bleeding internally, and her hemoglobin dropped to an unacceptably low level. As a result, Rozier needed a blood transfusion. Plaintiff's own expert witnesses agreed that Rozier likely would have survived had she been transfused with blood.[7] Internal bleeding accompanied by an unacceptably low hemoglobin level was a grave injury threatening Rozier's life. The blood transfusion was a necessary medical procedure under the circumstances, and there is no evidence that there was an alternative treatment available. Had the blood transfusion been accepted, Rozier "likely would have survived." Reasonable minds could not disagree that the blood transfusion was a reasonable means under the circumstances to minimize damages following Rozier's original injury, i.e., to avoid Rozier's death and the damages arising from her death.

---

[6] Such other subjective reasons might include a heightened fear of blood transfusions (unrelated to objective data) due to the risk of contracting bloodborne infections such as Hepatitis or HIV.

[7] In his deposition testimony, Dr. Nasimul Ahsan agreed with defense counsel that Rozier "would have survived had she accepted blood products." In his deposition testimony, Dr. Harold Yang similarly agreed with defense counsel that Rozier's life "could have been saved" and that she "likely would have survived" had she been transfused with blood.

Therefore, because the blood transfusion was refused under these circumstances, reasonable minds could not disagree that reasonable efforts were not made to avoid Rozier's death and the resulting damages. The trial court did not err by concluding that the doctrine of avoidable consequences precluded plaintiff from recovering damages for Rozier's death.

Finally, plaintiff argues that the trial court improperly invoked the doctrine of avoidable consequences to bar plaintiff from compensation for damages other than those stemming from Rozier's death. We conclude that plaintiff has waived this issue.

It *is* well established that "[a] party who waives a right is precluded from seeking appellate review based on a denial of that right because waiver eliminates any error." *The Cadle Co*, 285 Mich App at 255. A waiver is a "voluntary and intentional abandonment of a known right." *Quality Prod & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 374; 666 NW2d 251 (2003). "A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Grant v AAA Mich/Wisconsin, Inc (On Remand)*, 272 Mich App 142, 148; 724 NW2d 498 (2006). " '[A] party is not allowed to assign as error on appeal something which his or her own counsel deemed proper at trial since to do so would permit the party to harbor error as an appellate parachute.' " *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 683; 630 NW2d 356 (2001), quoting *Dresselhouse v Chrysler Corp*, 177 Mich App 470, 477; 442 NW2d 705 (1989).

The representations by plaintiff's counsel in the trial court establish that plaintiff voluntarily and intentionally abandoned any right to pursue damages other than those stemming from Rozier's death, such as for any pain and suffering that Rozier may have experienced

because of the alleged malpractice before she died. On December 14, 2011, the trial court held a hearing to address defendants' motions for summary disposition. During the hearing, the following exchange occurred between the court and plaintiff's counsel regarding the damages plaintiff was seeking:

> *The Court*: You're not --- you're not suing for damages short of her dying, though, right? You're. suing for what happened after that point in time?
>
> [*Plaintiff's Counsel*]: Exactly.

Plaintiff's counsel and the court also had the following exchange at the conclusion of the hearing when discussing the motion for summary disposition with regard to the doctrine of avoidable consequences:

> [*Plaintiff's Counsel*]: I just want --- the only thing I want to let the Court know is that --- it's essentially a motion for summary disposition because there are no economic claims in this case. She wasn't working and she --- she died, you know, on --- on the table. So if --- if that motion's granted, that's dispositive on the entire case, not partially dispositive. I just want the Court to be clear on that.
>
> *The Court*: All right.

Plaintiff is seeking to reopen a door to recover damages unrelated to the death, a door that he intentionally closed at the trial court level. Plaintiff has waived this issue.[8] See

---

[8] We reject plaintiff's contention that this issue is not waived because counsel's statements were ambiguous and counsel did not have an opportunity to fully express himself during the motion hearing due to repeated interruption by the court and opposing counsel. Our review of the transcript from the motion hearing reveals that counsel, although often interrupted, had ample opportunity to express himself on his client's behalf. Counsel's statements were not ambiguous. Finally, counsel had ample opportunity to express himself on behalf of plaintiff in the written responses to defendants' motions for summary disposition. At no point did plaintiff argue that that application of the doctrine of avoidable consequences would only entitle defendants to partial summary disposition.

*Hilgendorf*, 245 Mich App at 683; *Quality Prod & Concepts Co*, 469 Mich at 374; *The Cadle Co*, 285 Mich App at 255.

Accordingly, we conclude that the trial court did not err by granting summary disposition in favor of defendants.

Affirmed.

DONOFRIO and BECKERING, JJ., concurred.

BOONSTRA, P.J. (*concurring*). I fully concur in the majority opinion and in its excellent analysis. I write separately to emphasize that our opinion should not be interpreted as reflective of any viewpoint regarding religion generally or any particular religious belief or expression. To the contrary, it is reflective of the spirit of the First Amendment of the United States Constitution and its guarantee of every person's right to freely exercise and express the religious beliefs of his or her choice, without governmental interference.

That said, however, it bears noting that every person bears responsibility for the decisions and choices that he or she makes in life. People make decisions and choices in all aspects of their lives, and for untold hosts of reasons. But regardless of the reasons, decisions and choices have consequences. It is the essence of personal responsibility that the makers of decisions and choices, relative to their own lives, bear the consequences that flow from those decisions and choices. Our recognition of that fact is in no respect a criticism or indictment (or endorsement, for that matter) of any person's decision or choice (or of the reasons for which it was made). It is merely an acknowledgement of the principle of personal responsibility.

In this sad case, Gwendolyn Rozier and her family made a choice, and decided to forgo a blood transfusion that likely would have saved her life. In her particular case, and while the reasons could have been many, the reason for doing so was based on her religious beliefs. But the reason simply does not matter. The choice was hers to make, whether for reasons of religion, or for altogether different reasons entirely, or in fact for no reason at all. But as in any aspect of life, in which choices result in consequences, Ms. Rozier's choice resulted in a consequence for her. Sadly, that consequence was her death.

However unfortunate the nature of that consequence, it does not provide a basis for shifting responsibility for the consequence of Ms. Rozier's choice to others.[1] That choice, no matter how principled, admirable, and honorable it might have been, was hers and hers alone to make, and with that choice came the consequences that naturally flowed from it, irrespective of the righteousness of the reasons for which she made her choice.

For these additional reasons, I concur in the majority opinion.

---

[1] In this case, that shifting of responsibility would place Ms. Rozier's medical professionals in the untenable position of having to choose between bearing legal responsibility for the consequences of Ms. Rozier's religion-based choices or, alternatively, opting not to treat her. In either event, they likely would face legal action, of different sorts. The First Amendment does not require that medical professionals be placed between such a rock and hard place.