# STATE OF MICHIGAN

# COURT OF APPEALS

COLBURN HUNDLEY, INC.,

Plaintiff-Appellant,

v

WEST MICHIGAN DEVELOPERS, INC.,

Defendant-Appellee.

UNPUBLISHED
August 10, 2017

No. 333201
Kent Circuit Court
LC No. 14-008641-CK

Before: HOEKSTRA, P.J., and MURPHY and K. F. KELLY, JJ.

PER CURIAM.

In this action for breach of contract seeking payment of a commission related to the sale of real estate, plaintiff Colburn Hundley, Inc. appeals as of right the trial court's order granting summary disposition in favor of defendant West Michigan Developers, Inc. ("WMD") under MCR 2.116(C)(10). Because plaintiff is not contractually entitled to the payment of a commission, we affirm.

Plaintiff is a real estate firm, owned and operated by Jeffrey Hundley.[1] In 2010, WMD owned 30.51 acres of undeveloped land ("the property") in Byron Center, Michigan. WMD is owned and operated by its president, Peter Bultsma. Hundley, Bultsma, and a third individual, W. Sidney Smith, were also members in JPW 84th Street, LLC ("JPW"), a development company that planned to develop the property.

On the morning of April 14, 2010, WMD entered into an option agreement with JPW ("the JPW agreement"). The JPW agreement provided JPW with an exclusive option to purchase the property for a term of one year. If the option to purchase was not exercised, it would terminate on April 14, 2011.

On the afternoon of April 14, 2010, WMD entered into an "Agency Agreement" naming plaintiff, through its agent Hundley, as the exclusive real estate broker for the property at a brokerage fee of 8 percent. The Agency Agreement provided that the agreement would expire

---

[1] In this opinion, references to "Hundley" are to Jeffrey Hundley and plaintiff Colburn Hundley will be referred to as "plaintiff."

-1-

on April 13, 2011. However, the Agency Agreement contained what plaintiff characterizes as a "six month protection period" insofar as the Agency Agreement specified that a commission would be paid if there "is a sale within 6 months after expiration of the listing period . . . to a Buyer who had been introduced or provided information regarding the [property] during the listing period[.]" Significantly, as set forth in more detail *infra*, the Agency Agreement also contained a clause suspending the running of the Agency Agreement in the event that WMD grants someone an option to purchase or lease the property.

WMD did not sell the property between April of 2010 and April of 2011. Approximately one year after the initial JPW agreement and the initial Agency Agreement were signed, both contracts were extended for a second year. In particular, on April 1, 2011, WMD and JPW entered into an agreement to extend the option period under the JPW agreement until April 1, 2012. Likewise, on April 5, 2011, WMD and Hundley signed an amendment to the Agency Agreement, changing the expiration date on the Agency Agreement to April 13, 2012. Undisputedly, the JPW agreement expired on April 1, 2012. However, the parties debate whether the Agency Agreement expired on April 13, 2012.

In any event, the property did not sell before April 13, 2012 or within 6 months thereafter. Eventually, WMD sold the property on July 15, 2014 to Pembroke Acquisition Company, LLC ("Pembroke") for a purchase price of $6,600,000. Between April 13, 2012 and the sale of the property in July of 2014, there were discussions between Bultsma and Hundley relating to the listing of the property and the possibility of a brokerage fee. Moreover, it appears that Hundley played a role in the sale of the property to Pembroke. Nevertheless, WMD ultimately did not pay plaintiff a commission.[2]

After the sale, plaintiff filed the current lawsuit, claiming that plaintiff was entitled to a real estate commission as a result of the sale of the property. WMD moved for summary disposition under MCR 2.116(C)(10), arguing that the contract to pay plaintiff a real estate commission expired long before the sale of the property and that there was no new written agreement for the payment of a real estate commission as required by MCL 566.132(1)(e). The trial court found that there was no contract for the payment of a real estate commission, and the court granted summary disposition to WMD. Plaintiff now appeals of right.

On appeal, plaintiff argues that the trial court erred in granting summary disposition to WMD because there is a written contract between WMD and plaintiff for the payment of a real estate commission. Specifically, plaintiff makes two claims regarding WMD's contractual obligation to pay a brokerage fee. First, plaintiff contends that it is entitled to an 8% fee under the Agency Agreement because the JPW option agreement suspended the running of the Agency Agreement, such that the Agency Agreement did not expire until April of 2014 and the sale in July of 2014 was within the six month protection provision. Second, JPW maintains that, even if the Agency Agreement had expired, Hundley and Bultsma reached a new agreement entitling plaintiff to either 3% or 8%. Alternatively, plaintiff argues that the trial court should have

---

[2] As a result of the sale, Pembroke's real estate broker received a 5% commission of $330,000.

allowed plaintiff to amend its complaint to add a claim for unjust enrichment or quantum meruit. We disagree.

## I. STANDARDS OF REVIEW

We review a trial court's ruling on a motion for summary disposition de novo. *Auto Club Group Ins Co v Burchell*, 249 Mich App 468, 479; 642 NW2d 406 (2001). "When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all the evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact." *Sisk-Rathburn v Farm Bureau Gen Ins Co of Mich*, 279 Mich App 425, 427; 760 NW2d 878 (2008). "There is a genuine issue of material fact when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party." *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

Issues involving the existence and interpretation of a contract are questions of law, which we review de novo. *Kloian v Domino's Pizza LLC*, 273 Mich App 449, 452; 733 NW2d 766 (2006). In comparison, this Court reviews a trial court's decision regarding the amendment of pleadings for an abuse of discretion. *Ormsby v Capital Welding, Inc*, 471 Mich 45, 53; 684 NW2d 320 (2004). "An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes." *Ronnisch Construction Group, Inc v Lofts On the Nine, LLC*, 306 Mich App 203, 208; 854 NW2d 744 (2014).

## II. THE AGENCY AGREEMENT

On appeal, plaintiff first argues that it is entitled to an 8% commission based on the fee provision in the Agency Agreement. By its plain terms, the Agency Agreement, as amended in April of 2011, was set to expire on April 13, 2012. However, plaintiff argues that the JPW option agreement triggered the suspension provision in paragraph 5 of the Agency Agreement, such that the Agency Agreement was suspended and it did not begin to run until the expiration of the JPW option on April 1, 2012. Given the amendment to the Agency Agreement's expiration date, plaintiff also contends that the Agency Agreement was a two year agreement and that, after it began to run in April of 2012, it did not expire until April of 2014, meaning that the sale in July of 2014 fell within the six month protection provision. In contrast, WMD maintains that the JPW agreement, which was signed before the Agency Agreement, did not trigger the suspension clause and that, alternatively, even if suspended by the JPW agreement, the Agency Agreement expired in April of 2013 because its "original term" was for one year. Thus, as a question of contract interpretation we must decide whether the JPW agreement suspended the Agency Agreement and, if so, whether the sale in July of 2014 fell within the time period of the Agency Agreement's effectiveness following the suspension.

"The goal of contract interpretation is to first determine, and then enforce, the intent of the parties based on the plain language of the agreement." *Harbor Park Mkt, Inc v Gronda*, 277 Mich App 126, 130; 743 NW2d 585 (2007). To ascertain the parties' intent, the words of a contract are interpreted in accordance with their plain and ordinary meaning. *McCoig Materials, LLC v Galui Const, Inc*, 295 Mich App 684, 694; 818 NW2d 410 (2012). Further, contracts are read "as a whole, giving harmonious effect, if possible, to each word and phrase." *Wilkie v Auto-*

*Owners Ins Co*, 469 Mich 41, 50 n 11; 664 NW2d 776, 781 (2003). "If the language of the contract is clear and unambiguous, it must be enforced as written." *McCoig Materials, LLC*, 295 Mich App at 694.

In this case, plaintiff contends that the JPW option agreement suspended the running of the Agency Agreement. Plaintiff's argument is based on paragraph 5 of the Agency Agreement, which states:

> 5. **OPTIONS.** In the event [WMD] grants an option to purchase or lease the Premises, other than an option which is part of a lease, [WMD] agrees that the running of the term of this listing shall automatically be suspended for the duration of the option and, upon the expiration of the option, shall automatically recommence and continue for the remainder of said term so that the listing period before and after the option will total the original term of this listing.

Considering the plain and ordinary language of this provision, we agree with WMD's assertion that the JPW option agreement did not suspend the running of the Agency Agreement because paragraph 5 of the Agency Agreement is forward-looking and could not be suspended by an option agreement that pre-existed the Agency Agreement. In particular, paragraph 5 begins with the phrase "[i]n the event." The word "event" when used in the phrase "in the event" refers to "a postulated outcome, condition, or eventuality," *Merriam-Webster's Collegiate Dictionary* (2014), and the phrase "in the event" may be used interchangeably with phrases such "[i]f it should happen" or "in case," *The American Heritage Dictionary* (2011). Thus, as commonly understood, the phrase "in the event" suggests that something might happen in the future, and it cannot logically be read to refer to an event that has already occurred with certainty in the past. This forward-looking intent is confirmed by the last sentence of paragraph 5, which refers to "the listing period before and after the option." For there to be a listing period *before* the option, the listing period in the Agency Agreement must begin running before WMD grants an option on the property. In other words, when paragraph 5 is read as a whole, it is clear that the parties intended that the Agency Agreement would begin running when it was signed and that it would only be suspended at some future point "in the event" WMD grants an option.

The undisputed facts in this case show that the JPW option agreement pre-existed the Agency Agreement. Although the contracts were signed on the same day, the JPW agreement was signed in the morning on April 14, 2010 and the Agency Agreement was signed in the afternoon on April 14, 2010. For the reasons we have discussed, the pre-existing JPW agreement did not suspend the running of the Agency Agreement. Indeed, there was no listing period for the JPW option agreement to "suspend" because the Agency Agreement had not yet been signed.[3] Overall, it is clear that the parties did not intend for the Agency Agreement to be

---

[3] On appeal, plaintiff contends that, if the JPW agreement and Agency Agreement ran simultaneously, the JPW agreement made it impossible for Hundley to market the property during the time that the Agency Agreement was in effect. This argument does not alter our analysis of the plain language of paragraph 5. First, we note that Hundley was not a stranger to the JPW agreement, meaning that, when he entered into the Agency Agreement, he was fully

suspended by the pre-existing JPW agreement, and thus the Agency Agreement began running on April 14, 2010.

Arguably, the signing of the amendment to the JPW agreement on April 1, 2011 triggered the suspension clause in the Agency Agreement because it was an event that did not occur before the signing of the Agency Agreement. But, even if this were the case, the amended JPW agreement expired on April 1, 2012, at which time the Agency Agreement resumed running. Assuming that the Agency Agreement had a two-year term,[4] considering the listing period before April 1, 2011 (352 days) and after April 1, 2012 (378 days), the Agency Agreement still would have expired in April of 2013, and the six month protection provision would have ended in October of 2013. Thus, the sale to Pembroke in July of 2014 occurred long after the expiration of the Agency Agreement, and plaintiff is not entitled to an 8% commission under the Agency Agreement resulting from the sale of the property. Accordingly, the trial court properly granted summary disposition under MCR 2.116(C)(10).

### III. NEGOTIATIONS FOR A NEW AGREEMENT

Apart from plaintiff's reliance on the Agency Agreement, plaintiff also argues on appeal that Hundley and Bultsma reached a new agreement, after April of 2012, for the payment of a real estate commission. Plaintiff acknowledges that there is no one, clear written agreement specifying the terms of the real estate commission. However, plaintiff argues that such an agreement may be pieced together from various emails exchanged between Hundley and Bultsma as well as references to real estate fees in documents between WMD and Pembroke. According to plaintiff, these various documents require WMD to pay plaintiff 8% or,

---

aware of JPW's option on the property and the effect of this option on the property's marketability. Second, in light of the six month protection provision, the JPW agreement, which had a term of one year, would not necessarily have prevented Hundley from selling the property and collecting a commission after the JPW option expired. Hundley was free to contract as he saw fit, *Wilkie*, 469 Mich at 51; and it appears that, in signing both agreements on April 14, 2010, he placed himself in a position to either buy the property under the JPW option agreement or to receive a commission for a sale to someone else under the Agency Agreement. We will not re-write the plain language of the Agency Agreement merely because he is now dissatisfied with the length of the Agency Agreement.

[4] On appeal, WMD argues that, for purposes of applying paragraph 5 of the Agency Agreement, the Agency Agreement only had a 1-year term because the "original term" of the Agency Agreement was 1-year. In this regard, when the amendment to the Agency Agreement was signed, the expiration date on the Agency Agreement was changed to April 13, 2012, effectively extending the agreement to a 2-year term. However, the amendment did not make any changes to paragraph 5, which still contains reference to the "original term" of the listing and the "original term," according to WMD, is one year. Read in this way, WMD maintains that, even if the Agency Agreement was suspended by the JPW agreement from April 14, 2010 until April 1, 2012, the total "original term" is only one year and thus, at most, the Agency Agreement would run one year: from April of 2012 until April of 2013. Given our analysis of the Agency Agreement, we need not decide what is meant by the phrase "original term."

alternatively, 3% if the 5% commission paid to Pembroke's broker is deducted from the full 8% commission for the sale. We disagree.

The statute of frauds, MCL 566.132(1)(e), "requires that every contract to pay a commission for or upon the sale of any interest in real estate must be in writing and signed by the party to be charged or by a lawfully authorized agent." *Craib v Comm on Nat'l Missions of Presbytery of Detroit of United Presbyterian Church, USA*, 62 Mich App 617, 621; 233 NW2d 674 (1975). "The statute of frauds does not require that the entire agreement be in writing," and the statute of frauds may be satisfied by "several separate papers and documents, not all of which are signed by the party to be charged, and none of which is a sufficient memorandum in itself." *Kelly-Stehney & Assoc, Inc v MacDonald's Indus Products, Inc (After Remand)*, 265 Mich App 105, 111-112; 693 NW2d 394 (2005) (quotation marks and citation omitted). However, whether a writing is sufficient to satisfy the statute of frauds is a separate inquiry from whether the substance of the document demonstrates the formation of a contract under traditional contract principles. *Zurcher v Herveat*, 238 Mich App 267, 279; 605 NW2d 329 (1999).

In this case, we do not disagree with plaintiff's contention that there are a variety of writings which would likely satisfy the statute of frauds *if* those writings demonstrated the formation of a contract. In other words, while plaintiff focuses on the statute of frauds, the real question in this case is whether there was "mutual assent or a meeting of the minds on all the essential terms." *Kloian*, 273 Mich App at 453. "The burden is on plaintiffs to show the existence of the contract sought to be enforced, and no presumption will be indulged in favor of the execution of a contract since, regardless of the equities in a case, the court cannot make a contract for the parties when none exists." *Kamalnath v Mercy Mem Hosp Corp*, 194 Mich App 543, 549; 487 NW2d 499 (1992) (citation omitted). "Mere discussions and negotiation, including unaccepted offers, cannot be a substitute for the formal requirements of a contract." *Id.*

Applying these basic contract principles, it is clear that plaintiff has not shown the existence of a contract. Instead, the documents offered by plaintiff demonstrate nothing more than discussions and negotiations about the possibility of a new contract for the payment of a commission following the expiration of the Agency Agreement. For instance, in 2012, Hundley asked Bultsma to re-sign the Agency Agreement, but Bultsma declined to extend the listing period. Later, in the spring of 2013, Hundley sent Bultsma a new commission agreement, which Bultsma rejected. Instead, Bultsma offered Hundley a commission of 1½ percent, which Hundley rejected. Hundley then responded with a counteroffer, requesting a commission of 3 percent, which Bultsma never accepted. These various unaccepted offers and counteroffers do not demonstrate the existence of a contract. *Id.* Instead, it appears that, following the expiration of the Agency Agreement, Huntley and Bultsma negotiated but never reached a new agreement for the payment of a real estate commission.[5] Absent such an agreement, plaintiff's contract

---

[5] Plaintiff notes on appeal that in documents between WMD and Pembroke, such as a letter of intent and the purchase agreement, it was stated that WMD would pay any brokerage fees associated with the sale. However, these documents were not a contract between WMD and plaintiff for the payment of a real estate commission. To the contrary, these documents

claim for a real estate commission is without merit, and the trial court properly granted summary disposition under MCR 2.116(C)(10).

## IV. AMENDMENT OF THE COMPLAINT

Finally, plaintiff contends that the trial court erred by not providing plaintiff with an opportunity to amend its complaint under MCR 2.116(I)(5) to add claims of unjust enrichment or quantum meruit. However, the representations of plaintiff's counsel in the trial court constituted a waiver of plaintiff's assertion that it should be allowed to amend its pleadings. See *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014).

In particular, at the summary disposition hearing, the trial court specifically asked whether plaintiff could pursue a claim of unjust enrichment or whether "the statute of frauds problem" prevented such claims. In response, plaintiff's counsel stated that this was a "contract case" governed by the statute of frauds and that other claims had not been pled because they were "not allowed" under the statute of frauds. "A party who expressly agrees with an issue in the trial court cannot then take a contrary position on appeal." *Id.* (citation omitted). Further, "[a] party is not allowed to assign as error on appeal something which his or her own counsel deemed proper [in the trial court] since to do so would permit the party to harbor error as an appellate parachute." *Id.* (citations and quotation marks omitted). Consequently, having conceded that this was a "contract case" and that there were no other claims to be pled, plaintiff cannot now complain that the trial court did not allow plaintiff to amend its complaint under MCR 2.116(I)(5).

Affirmed. Having prevailed in full, WMD may tax costs pursuant to MCR 7.219.

/s/ Joel P. Hoekstra
/s/ William B. Murphy
/s/ Kirsten Frank Kelly

---

expressly state that the commission would be set forth in a "separate agreement." As we have discussed, Hundley and Bultsma negotiated, but they did not reach an agreement, and thus the fact remains that there is no agreement entitling plaintiff to a real estate commission.