# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MURPHY, Minors.

UNPUBLISHED
April 14, 2016

Nos. 328791; 328796
Macomb Circuit Court
Family Division
LC Nos. 2014-000284-NA
            2014-000285-NA
            2014-000286-NA
            2014-000287-NA

Before:  O'CONNELL, P.J., and MARKEY and O'BRIEN, JJ.

PER CURIAM.

In these consolidated appeals, respondent-father H. Murphy (Docket No. 328791) and respondent-mother K. Murphy (Docket No. 328796) each appeal as of right the trial court's order terminating their parental rights to their four minor children under MCL 712A.19b(3)(b)(*i*) (parent caused severe abuse), (b)(*ii*) (parent failed to prevent severe abuse), (g) (failure to provide proper care and custody), and (j) (risk of harm if children returned to parents).  We affirm.

## I.  FACTUAL BACKGROUND

### A.  ADJUDICATION

The Department of Health and Human Services (DHHS) removed the four minor children from the Murphys in December 2013 after the children's infant sibling died while in the Murphys' care.  The trial court held an adjudication trial by jury to determine its jurisdiction over the children.

At the trial, Sterling Heights Police Detective Mark Glazewski testified that, in October 2013, the Murphys' 11-month-old daughter died of a morphine overdose.  When he was at the home, there was clothing and debris scattered around, and live electrical cords resembling long jumper cables—which the Murphys used to illegally pirate power from a neighbor's home—crossed the floors.  The child's crib was filled with junk and debris.  Mother told him that the child's grandmother had died recently of terminal cancer, for which she had been prescribed morphine, and mother must have misplaced one of the morphine pills.  Police found a bottle of 60 milligram morphine pills in the home, an amount consistent with the dose that killed the child.

-1-

Marquita Gaines testified that the Murphys had an extensive history with Children's Protective Services (CPS). These complaints included burns on the children, that the children were left at an abandoned home without utilities, that the Murphys struck the children with objects, that the children attended school without clean clothes or hygiene, and that one of the children stole food and they reported being hungry. While CPS did not substantiate all of the complaints, Gaines found the pattern concerning. The older son was taken to a dentist while in foster care, and the dentist testified that when he treated the child, he had gingivitis and periodontitis, severe problems that took a long time to accumulate.

According to Gains, she filed a protective petition over the Murphys' remaining children because the Murphys had a history of unsuitable housing. Taneisha Sims, the children's foster care caseworker, testified that the children were placed with a paternal aunt. Sims testified that the aunt met the children's medical and dental needs and that the children's grades improved.

According to Detective Glazewski, when the infant died, mother was pregnant. After mother gave birth, mother left the hospital with the child and officers were unable to locate the child for five months. Mother and father would drive in circles for hours after court hearings to lose surveillance vehicles. Sims testified that mother only stated there was "no baby," and both parents refused to return her calls. A relative eventually delivered the infant to authorities.

Dr. Patrick K. Ryan testified that he was a licensed psychologist and board-certified neuropsychologist who had practiced psychology for 40 years. The parties stipulated to Dr. Ryan's expertise as a psychologist. According to Dr. Ryan, he performed psychological evaluations of the Murphys in 2009, and he administered the three standard tests he had used over 20,000 times to determine their personality functioning and its impact on parenting. While neither mother nor father suffered from mental disorders, they both did not believe they required assistance. Father's answers to questions indicated he did not take the process seriously and was not invested in it.

The children fell asleep in Dr. Ryan's waiting room and did not appear to be well-mannered or cared for. The oldest child had significant cognitive impairments, the middle child was energetic and pleasant but had mild cognitive impairments, the youngest child was highly intelligent, and he could not evaluate the infant. All the children were positively bonded to their parents, but Dr. Ryan opined that the children required stable environments and nurturing from diligent parents to reach their full potential.

Following the testimony, the jury found that DHHS had proven one or more grounds for the trial court to take jurisdiction over the children.

## B. DISPOSITION

At the dispositional hearing, Dr. Ryan updated the trial court to inform it that he had attempted to make further contact with the Murphys to provide services, but they had not contacted him. The Murphys chose not to testify because they had pending criminal charges involving the infant's death.

The trial court found that the Murphys' home was filthy and deplorable and had hazardous conditions such as morphine and live electrical wires on the floor. It also found that

the Murphys had an extensive history with the Department and "don't take any of it seriously." On the basis of the testimony at the adjudication, the trial court found there was clear and convincing evidence that one or both of the Murphys' acts or omissions had caused the death of their 11-month-old infant. It also found that the evidence showed the Murphys failed to provide their children with proper care, and that the children would be harmed if returned to the home.

The trial court spent an extensive amount of time discussing the children's best interests. It found that, while the children loved their parents and the parents loved the children, other factors supported terminating the parents' rights. The parents failed to keep a decent home and keep the children clean and healthy. They failed to provide for the children's physical needs for food, clothing, and medical care. The children had stabilized in their current placement, but had little permanence and stability with the Murphys, who had moved around a lot. The children had not been doing well in school until they were placed in foster care, where they were "doing way better in the current placement by all counts." It noted that the children had a family connection and found that the children's safety was a paramount concern. Accordingly, the trial court determined that terminating the Murphys' parental rights was in the children's best interests.

## II. STANDARDS OF REVIEW

This Court reviews for clear error a jury's verdict regarding the trial court's jurisdiction over children. See *In re BZ*, 264 Mich App 286, 295; 690 NW2d 505 (2004). We review for clear error the trial court's factual findings and ultimate determinations on the statutory grounds for termination. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). We also review for clear error the trial court's determination regarding the children's best interests. *In re Trejo Minors,* 462 Mich 341, 356-357; 612 NW2d 407 (2000). A finding is clearly erroneous if, after reviewing the entire record, we are definitely and firmly convinced that the trial court made a mistake. *Mason*, 486 Mich at 152. We review for an abuse of discretion challenges to the trial court's evidentiary rulings. *In re Utrera*, 281 Mich App 1, 15; 761 NW2d 253 (2008). The trial court abuses its discretion when its decision falls outside range of principled outcomes. *Id*.

## III. ADJUDICATION AND EXPERT TESTIMONY

Mother and father challenge the sufficiency of the adjudication on different grounds. Father argues that Dr. Ryan impermissibly testified as an expert without the trial court admitting him as such, and mother argues that insufficient evidence supported the jury's verdict. We disagree with both arguments.

Father has waived any contention regarding Dr. Ryan's qualifications as an expert. "A waiver is the intentional relinquishment or abandonment of a known right." *Acorn Investment Co v Mich Basic Prop Ins Ass'n*, 495 Mich 338, 357; 852 NW2d 22 (2014) (quotation marks and citation omitted). A party's waiver precludes that party from asserting an error on appeal. *Braverman v Granger*, 303 Mich App 587, 608; 844 NW2d 485 (2014). In this case, father stipulated to Dr. Ryan's qualifications at the adjudication. He cannot now challenge them on appeal.

Mother contends that there was no proof of neglect or harm to the children at the adjudication. At the adjudication, the petitioner must prove by a preponderance of legally

admissible evidence that the children are subject to the trial court's jurisdiction. *In re S R*, 229 Mich App 310, 314; 581 NW2d 291 (1998). MCL 712A.2(b) grants the trial court jurisdiction over children

> (1) [w]hose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, . . . [or]

> (2) [w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

While mother credits the testimony of witnesses who testified that the home was in a temporary state following the death of the children's grandmother, the presence of conflicting testimony creates a question of credibility, which is for the trier of fact to determine. See *People v Lemmon*, 456 Mich 625, 642-643; 576 NW2d 129 (1998). This Court defers to the credibility findings of the trier of fact and will not substitute our judgment for that of the jury. See *Woodington v Shokoohi*, 288 Mich App 352, 358; 792 NW2d 63 (2010).

Mother focuses on the supposedly temporary disarray in the home, but this case went beyond a messy house. As previously described, at the adjudication in this case, Detective Glazewski detailed the dangerous conditions in which the children were found. And Gains testified that the children were subject to ongoing neglect and that this was not the first unsafe environment in which the children lived. The Department previously provided the Murphys with housing-related services. What is unfortunate is that it took the death of a child for the surviving children to be removed from the Murphys' care. We are not definitely and firmly convinced that the jury made a mistake when it found that the Murphys had neglected to provide support for the children or had provided the children with an unsafe home environment.

## IV. STATUTORY GROUNDS

The Murphys both challenge the trial court's finding that statutory grounds supported terminating their parental rights. We disagree.

The Department has the burden to prove the existence of a statutory ground by clear and convincing evidence. MCL 712A.19b(3); *Mason*, 486 Mich at 166. Clear and convincing evidence is "evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re Martin*, 450 Mich 204, 227; 538 NW2d 399 (1995) (quotation marks and citation omitted, alteration in original).

MCL 712A.19b(3)(b) provides that the trial court may terminate a parent's rights if

> The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

(*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

(*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

Termination under MCL 712A.19b(3)(b)(*i*) and (*ii*) is appropriate when "at least one of [the parents] had perpetrated the abuse and at least one of them had failed to prevent it[.]" *In re Ellis*, 294 Mich App 30, 35; 817 NW2d 111 (2011). "Evidence of how a parent treats one child is evidence of how he or she may treat the other children." *In re Hudson*, 294 Mich App 261, 266; 817 NW2d 115 (2011).

MCL 712A.19b(3)(g) provides that the trial court may terminate a parent's rights if

[t]he parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

And MCL 712A.19b(3)(j) provides that the trial court may terminate parental rights if

[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

A parent's failure to comply with his or her service plan is evidence that the parent will not be able to provide a child with proper care and custody and that the child may be harmed if returned to the parent's home. *In re White*, 303 Mich App 701, 710-711; 846 NW2d 61 (2014).

In this case, the Murphys' 11-month-old infant died after consuming morphine in their extremely dirty house. This was not the only dangerous condition present: Detective Glazewski testified that electrical wires also ran across the floor and that he could have been electrocuted if he stepped on them. The Department previously provided the Murphys with services and they still failed to maintain decent housing. Additionally, during the pendency of the case, the Murphys not only failed to participate in services but fled with their new infant and concealed her from the authorities. There could hardly have been greater evidence that the Murphys did not intend to comply with a service plan designed to protect their children, but additionally, Gaines and Dr. Ryan testified that the Murphys consistently failed to contact them. Dr. Ryan also testified that the Murphys did not believe they needed assistance.

We are not definitely and firmly convinced that the trial court erred when it found that statutory grounds supported terminating the Murphys' parental rights. Clear and convincing evidence supported the trial court's findings that at least one of the Murphys caused the physical injury and one of them failed to prevent it, that the children were not properly cared for, and it

was reasonably likely that another child would suffer a serious physical injury if left in the Murphys' care.

## V.  BEST INTERESTS

Finally, mother contends that the trial court erred by determining the children's best interests without considering their placement with relatives and terminating her rights when she and the children had a positive bond.  We disagree.

The trial court must order the parent's rights terminated if it finds from a preponderance of evidence that termination is in the children's best interests.  *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012); *In re Moss*, 301 Mich App 76, 83; 836 NW2d 182 (2013).  To determine whether termination of a parent's parental rights is in a child's best interests, the court should consider a wide variety of factors that may include "the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home."  *Olive/Metts*, 297 Mich App at 41-42.  The trial court may also consider "a parent's history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption."  *White*, 303 Mich App at 714.  The trial court's factual findings concerning the child's best interests are factually inadequate if the child is placed with a relative, but the trial court does not consider that factor when determining the child's best interests.  *In re Mays*, 490 Mich 993, 994; 807 NW2d 307 (2012).

The trial court acknowledged that the children had a strong, positive bond with the Murphys.  But the children's bond with the parents is only one factor that the trial court should consider when determining the children's best interests.  In this case, the court considered a wide variety of factors, most of which it weighed against the Murphys.  These factors included the children's safety, permanence, stability, hygiene, living environment, other material needs, and improvement in their foster care placement.  Additionally, the trial court considered the children's placement with relatives.  It remarked on their "safety, permanency, and family connections" when deciding their best interests.  The trial court considered appropriate factors when determining the children's best interests, and we are not definitely and firmly convinced that it made a mistake.

We affirm.

/s/ Peter D. O'Connell
/s/ Jane E. Markey
/s/ Colleen A. O'Brien